No. 65,883

SYLVIA JANE WEST, Mother and Heir-at-Law of Robert Gust, Deceased, *Appellant,* v. ROBERT L. COLLINS, *Defendant,* and HICKS BROTHERS CHEVROLET, INC., *Appellee.*

(840 P.2d 435)

Opinion filed October 30, 1992.

*John Anderson, Jr.,* of Overland Park, argued the cause and was on the briefs for appellant.

*Benny J. Harding,* of Berman, DeLeve, Kuchan & Chapman, of Overland Park, argued the cause, and *Robert E. McRorey* and *David J. Weimer,* of the same firm, were with him on the briefs for appellee Hicks Brothers Chevrolet, Inc.

The opinion of the court was delivered by

ABBOTT, J.: This is an appeal by Sylvia Jane West, the mother and heir-at-law of Robert Gust, deceased, in a wrongful death action. The defendants are Robert L. Collins and Hicks Brothers Chevrolet, Inc. (Hicks Brothers). A car owned by Hicks Brothers and driven by Collins was involved in a one-vehicle accident, which resulted in the death of Gust, a passenger in the car.

The trial judge assessed 100 percent of the fault against Collins and 0 percent against Hicks Brothers. The deceased's mother appealed, and the Court of Appeals affirmed in an unpublished

opinion. We accepted review on the limited issue of vicarious or implied liability.

The defendant, Collins, was 19 years of age and in the market for a car. He arranged with his uncle, Bill Hicks, the owner of Hicks Brothers, to test drive a 1978 Pontiac Firebird Trans Am and to keep it for two days to show his parents. Collins' father did not have an opportunity to test drive the car, and Hicks subsequently granted Collins permission to keep the car longer than the two days to which he originally agreed. Collins next informed Hicks he would buy the car. The necessary paperwork to transfer title to Collins was not completed before the accident.

On the evening of the accident, Collins drove two friends, Gust and Todd Ginger, in the Trans Am to a party at a friend's house. Collins and Ginger became intoxicated and have no recollection of what happened after leaving the party. According to the first officer on the scene, as well as photographs and diagrams of the accident scene, the Trans Am was traveling at a high rate of speed when it spun out of control, struck a pole, and came to rest against another vehicle in a private parking lot. Collins, Gust, and Ginger were injured and taken immediately to a hospital. Gust died shortly after arrival at the hospital.

A wrongful death action was filed against Collins and Hicks Brothers. Collins was covered by his parents' liability policy, which provided secondary insurance. Hicks Brothers' liability insurance carrier had primary coverage. Hicks Brothers' insurance carrier apparently is insolvent. Collins' parents' insurance carrier paid its policy limits, and that sum was divided on an unequal basis between the plaintiff in this case and the other passenger in the car.

A covenant not to execute was given to Collins, his parents, and their insurance carrier. That covenant is not in the record, and its terms are disputed by the parties to this appeal. It is not an issue on appeal.

The case went to trial. The trial court held that the relationship between Hicks Brothers and Collins was a bailment, not an agency relationship, and that Hicks Brothers had not negligently entrusted the Trans Am to Collins. The trial court found damages of $342,490.70 and found Collins 100 percent at fault.

## Analysis

West argues that the Kansas Automobile Injury Reparations Act (KAIRA), K.S.A. 40-3101 *et seq.* (also referred to as the no-fault insurance act), which requires vehicle liability insurance, implies that the car owner is liable or creates a vicarious liability. Therefore, according to West, in order to find Hicks Brothers, the dealership that owned the vehicle, liable for the tortious acts of Collins, a permissive driver, it is not necessary to find that Hicks Brothers also committed a tort. She contends the public policy of this state mandates holding the owner liable for the negligent acts of a permissive driver. West does not limit her argument to car dealers and prospective buyers. She includes all owners and permissive drivers.

Hicks Brothers contends West is trying to convert the issue from one of liability to one of insurance coverage. The dealership also suggests this court will be overstepping its judicial role if strict liability is imposed upon a vehicle owner for the acts of a permissive driver.

The purpose of KAIRA is found at K.S.A. 40-3102, which states: "The purpose of this act is to provide a means of compensating persons promptly for accidental bodily injury arising out of the ownership, operation, maintenance or use of motor vehicles in lieu of liability for damages to the extent provided herein."

KAIRA requires every vehicle owner who operates his or her vehicle upon highways and public property to carry vehicle liability insurance, unless the owner falls within one of the exemptions in K.S.A. 1991 Supp. 40-3104. (Hicks Brothers does not fall within one of the exemptions.) Even nonresident owners of vehicles are required to carry liability insurance if operating their vehicles in Kansas. K.S.A. 40-3106. The owner's liability insurance policy is required to cover "the person named and any other person, as insured, using any such vehicle with the expressed or implied consent of such named insured, against loss from the liability imposed by law for damages arising out of the ownership, maintenance or use of any such vehicle." K.S.A. 40-3107(b).

The trial court disposed of West's arguments by finding the statutes and cases cited "ineffective to impose liability in a case

such as this, where the auto dealer has committed no underlying tort." In affirming the trial court, the Court of Appeals concluded:

"K.S.A. 40-3107(b) lists the required contents of an insurance policy but does not create a relationship between the owner or driver and a third party. Further, the language in K.S.A. 40-3107(b) does not automatically impose liability on the owner/insured for an accident between the covered driver and a third party. Liability of the owner/insured must still be determined under tort theories such as negligent entrustment."

West contends the decisions of the lower courts are contrary to the language of KAIRA. She maintains that because KAIRA charges the owner, not the driver, of the vehicle with these obligations, liability insurance "follows the vehicle." She suggests that if liability insurance follows the vehicle, then liability follows the vehicle, making the owner liable for any tortious act in which the owner's vehicle is involved, regardless of who was driving, at least to the extent of the required insurance. Otherwise, West claims, the law would not require the owner to insure permissive drivers. She also points out that a motor vehicle dealer will not be licensed in this state unless the dealer carries vehicle liability insurance "for the operation of any vehicle by prospective purchasers, owned or being offered for sale by the dealer when being operated by the owner or seller, the seller's agent, servants, employees, prospective customers or other persons." K.S.A. 8-2405.

The resolution of this case rests upon the construction of KAIRA. The principles of statutory construction are well established:

"Interpretation of a statute is a question of law, and it is the function of the court to interpret a statute to give it the effect intended by the legislature. It is a fundamental rule of statutory construction to which all other rules are subordinate that the intent of the legislature governs when that intent can be ascertained."

"When a statute is plain and unambiguous, the court must give effect to the intention of the legislature as expressed, rather than determine what the law should or should not be." *Martindale v. Tenny,* 250 Kan. 621, Syl. ¶¶ 1, 2, 829 P.2d 561 (1992).

Hicks Brothers maintains KAIRA is "quite unambiguous" in that it mandates liability coverage, not liability. The dealership points to the *imposed by law* language in K.S.A. 40-3107(b). The statute requires liability insurance polices to insure "against loss

from the liability imposed by law for damages arising out of the ownership, maintenance or use of any such vehicle." Hicks Brothers argues that the *liability imposed by law* language is the law of bailment, which requires a showing of negligent entrustment in order to find the bailor liable. The dealership argues that passage of a mandatory liability insurance scheme does not of itself abrogate the law of bailment. In support, Hicks Brothers attempts an analogy to *M. Bruenger & Co. v. Dodge City Truck Stop, Inc.*, 234 Kan. 682, 687, 675 P.2d 864 (1984), in which this court found that the adoption of comparative negligence did not change the law of bailment. The analogy is not convincing.

Hicks Brothers argues, in the alternative, that even if provisions of KAIRA are deemed ambiguous, the act must be construed in reference to the common law in effect at the time of the act's passage. Based on the above, Hicks Brothers argues that because negligent entrustment was the common law of this state prior to the enactment of KAIRA and because the act does not abrogate expressly the need to show negligent entrustment, KAIRA does not change the common law.

Guidance on this issue comes from both statutory and case law. K.S.A. 77-109 provides:

"The common law as modified by constitutional and statutory law, judicial decisions, and the conditions and wants of the people, shall remain in force in aid of the General Statutes of this state; but the rule of the common law, that statutes in derogation thereof shall be strictly construed, shall not be applicable to any general statute of this state, but all such statutes shall be liberally construed to promote their object."

In *Manzanares v. Bell*, 214 Kan. 589, Syl. ¶ 2, 522 P.2d 1291 (1974), this court held that "no person has a vested right in common-law rules governing a negligence action arising out of a motor vehicle accident so as to entitle him to insist the common law remain static for his benefit." See *Bair v. Peck*, 248 Kan. 824, Syl. ¶ 11, 811 P.2d 1176 (1991).

The question is not whether the legislature can change the common law, but whether the legislature intended KAIRA to change the common law. This will be addressed in conjunction with West's public policy argument.

Hicks Brothers also directs our attention to K.S.A. 1991 Supp. 40-3113a(a), which recognizes a cause of action "under circum-

stances creating a legal liability against a tortfeasor," to support the claim that KAIRA incorporates the common-law tort of negligent entrustment. Section 3113a(a) is referring to "[w]hen the injury for which personal injury protection [PIP] benefits are payable under this act is caused under circumstances creating a legal liability against a tortfeasor pursuant to K.S.A. 40-3117 or the law of the appropriate jurisdiction." The instant case does not involve PIP benefits, to which this section *specifically* refers.

West's second claim is that KAIRA creates a vicarious relationship between the owner and the permissive driver. The vicarious relationship, in turn, makes the owner liable for any negligent acts committed by the permissive driver. West maintains that if an owner can escape liability unless the owner also is negligent, then the requirement of mandatory liability insurance is worthless and the legislature's intent in enacting KAIRA is defeated.

In support of her claim, West cites two Michigan cases, *Perin v. Peuler*, 373 Mich. 531, 130 N.W.2d 4 (1964), and *Mich. Mut. Ins. Co. v. Sunstrum*, 111 Mich. App. 98, 315 N.W.2d 154 (1981). Neither case is helpful because Michigan explicitly imposes liability upon vehicle owners for the negligent acts of permissive drivers. Separate from its no-fault insurance act, Mich. Comp. Laws § 500.3101 *et seq.* (1979), Michigan law provides: "The owner of a motor vehicle shall be liable for any injury occasioned by the negligent operation of such motor vehicle . . . . The owner shall not be liable, however, unless said motor vehicle is being driven with his or her express or implied consent or knowledge." Mich. Comp. Laws § 257.401 (1979). The two cases plaintiff relies upon were decided after the enactment of the owner-liability statute.

Florida, pursuant to the dangerous instrumentality doctrine, has recognized a vicarious relationship between an owner of a vehicle, including a car dealer, and a permissive driver, including an individual who presented himself as a prospective customer but was in fact a thief. See *Jackson by and through Whitaker v. Hertz*, 590 So. 2d 929 (Fla. Dist. App. 1991); *Tillman Chevrolet Company v. Moore*, 175 So. 2d 794 (Fla. Dist. App. 1965). The *Hertz* court summarized the doctrine as follows:

"The dangerous instrumentality doctrine is a unique contribution of the Florida judiciary to the common law of this state. In its broad outlines, it imposes strict, vicarious responsibility upon the owner or other possessor of a motor vehicle who voluntarily entrusts it to another for any subsequent negligent operation which injures a member of the travelling public. [Citations omitted.] This liability extends to the negligent act of whomever is subsequently allowed to drive the car, [citations omitted] and 'no matter where the driver goes, starts or stops.' [Citations omitted.] Furthermore, '[w]here "original entrustment" is shown to exist, liability thus imposed on the owner will not be altered because of a departure beyond the scope of authority.' [Citation omitted.]

. . . .

"In very recent years, our supreme court, in the course of re-endorsing the validity of the doctrine, has set forth its essential basis:

'The dangerous instrumentality doctrine seeks to provide great financial responsibility to pay for the carnage on our roads. It is premised upon the theory that the one who originates the danger 'by *entrusting the automobile to another is in the best position to make certain that there will be* adequate resources with which to pay the damages caused by its negligent operation. If Florida's traffic problems were sufficient to prompt its adoption in 1920, there is all the more reason for its application to today's high-speed travel upon crowded highways. [e.s.]'

[Citation omitted.] It has also expressly characterized the legal nature of the initial 'consent' or 'entrustment' which is the basis of, and indeed establishes, liability under the doctrine:

'In the final analysis, while the rule governing liability of an owner of a dangerous agency who permits it to be used by another is based on consent, the essential authority or consent is simply consent to the use or operation of such an instrumentality beyond his own immediate control. Only to that limited extent is the issue pertinent when members of the public are injured by its operation, and only in a situation where the vehicle is not in operation pursuant to his authority, or where he has in fact been deprived of the incidents of ownership, can such an owner escape responsibility. Certainly the terms of a bailment, either restricted or general, can have no bearing upon that question. [e.s.]'

[Citation omitted.]" 590 So. 2d at 937-38.

Florida's position is unique. The annotation at 31 A.L.R.2d 1445, entitled *Dealer's liability for negligent operation of car by prospective purchaser or one acting for him,* is instructive and confirms the great weight of authority is that the owner would not be liable under the instant facts. See 12A Couch on Insurance 2d § 45:713 (rev. ed. 1981).

West's suggested vicarious relationship does not fall within the confines of current Kansas law. "Vicarious liability is a term gen-

erally applied to legal liability which arises solely because of a relationship and not because of any actual act of negligence by the person held vicariously liable for the act of another." *Leiker v. Gafford,* 245 Kan. 325, 355, 778 P.2d 823 (1989). A joint venture between a passenger and the driver of a vehicle also has been found to support vicarious liability. *Lightner v. Frank,* 240 Kan. 21, 727 P.2d 430 (1986). West does not contend that the facts of the instant case fall within any of these categories. West's vicarious liability argument is simply another way of stating that the statute implies liability upon the owner of the vehicle.

The Court of Appeals rejected West's argument, holding: "In Kansas, a dealer is liable only if it negligently entrusts a vehicle to an incompetent driver. *McCart v. Muir,* 230 Kan. 618, 641 P.2d 384 (1982). The relationship of dealer and 'permissive driver' or prospective purchaser is not sufficient to create vicarious liability."

Interestingly, *McCart* did not involve a motor vehicle dealer. In *McCart,* the father and 17-year-old son were listed as co-owners on the title to the car. The father co-signed the loan papers in order for his son to purchase the car. The son was driving the car with his father's permission at the time the son crashed head-on into another vehicle. The son was at fault, having a blood alcohol level of .22 percent. This court listed the issues on appeal as negligent entrustment, comparative negligence in negligent entrustment cases, and damages. KAIRA was not mentioned. Other than defining and applying the law of negligent entrustment, *McCart* offers no guidance for the instant case.

West does not appeal, at least to this court, the trial court's finding that the legal relationship between Collins and Hicks Brothers was that of bailee and bailor. "A bailment is the delivery of personal property by one person to another for a specific purpose, with an express or implied contract that when the purpose has been fulfilled the property will be returned or accounted for." *Western Motor Co. v. Koehn,* 12 Kan. App. 2d 215, 217, 738 P.2d 466 (1987), *aff'd* 242 Kan. 402, 748 P.2d 851 (1988). There is no question but that the relationship between Hicks Brothers and Collins was a bailment.

Hicks Brothers cites *Halverson v. Blosser,* 101 Kan. 683, 168 Pac. 863 (1917), and *Brown v. Keill,* 224 Kan. 195, 580 P.2d 867

(1978), for the proposition that a car owner is not liable for the borrower's acts if the borrower is not under the owner's control and if the bailed property is not used to further the owner's business. *Halverson* was decided many years before the enactment of KAIRA. The status of the law prior to KAIRA is not at issue. *Brown* considered the ramifications of the adoption of comparative fault on the law of bailment. The *Brown* court stated "that in the absence of evidence of a joint venture, agency or circumstances giving rise to vicarious liability, the negligence of a bailee of a vehicle is not imputable to the bailor in an action by the bailor against a third party for damage to the bailed vehicle." 224 Kan. at 197. Although *Brown* was decided after the enactment of KAIRA, there was no need to discuss KAIRA because the case involved only property damage. The only similarity between *Brown* and the case at hand is that both involved accidents in which the permissive driver was negligent.

West's final contention is that public policy supports a finding of implied liability because, according to West, our policy, as evidenced by enactment of the various automobile insurance acts, is to protect the public from damages and harm resulting from vehicle accidents on public highways. To address West's public policy contention, the intent of the legislature in enacting KAIRA must be ascertained.

"In determining legislative intent, courts are not limited to consideration of the language used in the statute, but may look to the historical background of the enactment, the circumstances attending its passage, the purpose to be accomplished, and the effect the statute may have under the various constructions suggested. In construing statutes, the legislative intention is to be determined from a general consideration of the entire act." *Todd v. Kelly,* 251 Kan. 512, Syl. ¶ 2, 837 P.2d 381 (1992).

"When a statute is susceptible to more than one construction, it must be construed to give expression to its intent and purpose, even though such construction is not within the strict literal interpretation of the statute." *Manzanares,* 214 Kan. 589, Syl. ¶ 15.

Generally speaking, "[t]he purpose of compulsory automobile liability insurance is to protect members of the general public injured on the highways through the operation of the covered motor vehicle, by giving them security for the payment of their

damages." 12A Couch on Insurance 2d § 45:682 (rev. ed. 1981). The intent of the legislatures in enacting no-fault insurance acts is to provide prompt compensation of specified benefits to insured victims of accidents, to prevent overcompensation for minor injuries, and to ease congestion in the court system by eliminating the need to prove fault in certain cases. 7 Blashfield Automobile Law and Practice § 272.10 (3d ed. rev. 1987); 8D Appleman, Insurance Law and Practice §§ 5151, 5154, and 5154.75 (1981). Our legislation appears to fall within these perimeters.

In *Manzanares,* 214 Kan. 589, this court upheld the constitutionality of KAIRA. West quotes the following passage from *Manzanares* as evidence of the legislature's intent to protect the public:

"The enactment of the Kansas No-Fault Act culminated many years of studying the present tort liability insurance system and its inability to deliver promptly compensation to automobile accident victims. The Act is a legislative response to a growing public demand for a change in the manner society deals with the enormous legal, social and economic problems resulting from motor vehicle accidents. Every citizen of this state is affected by the carnage occasioned by motor vehicle accidents occurring upon our highways. The state has an interest in protecting those who use the public highways and that interest is not limited to accident prevention. [Citation omitted.]" 214 Kan. at 601.

According to the *Manzanares* court, in enacting KAIRA, our legislature intended, among other things, to protect the public and to ensure that accident victims receive prompt compensation. See 214 Kan. at 599, 603-04, 608, 610; see also *Dinesen v. Towle,* 3 Kan. App. 2d 505, 507, 597 P.2d 264, *rev. denied* 226 Kan. 792 (1979) ("The legislature enacted no-fault as a means of providing compensation for injured persons in lieu of their filing lawsuits for damages in cases involving small sums of money and minor injuries."). This is further illustrated by the *Manzanares* court's discussion of the history of motor vehicle insurance in Kansas:

"As early as 1931, compulsory liability insurance for common carriers was required in this state. . . . In 1939 the growing concern over the number of uncompensated automobile accident victims found expression in the state's first financial responsibility law. [Citation omitted.] However, that legislation affected only persons convicted of certain offenses or persons who failed to satisfy a judgment arising out of a vehicle accident and required them to file proof of future financial responsibility. Failure to comply resulted in revocation of the person's license. [Citation omitted.]

"The inability of the financial responsibility law to accomplish the intended purpose resulted in the law being repealed and replaced by the Motor Vehicle Safety Responsibility Act. [Citation omitted.] The purpose of the Safety Responsibility Act was to afford members of the public protection from irresponsible drivers by requiring financial security from drivers and motor vehicle owners involved in vehicle accidents. [Citation omitted.] Again, in 1968 the Legislature spoke on the subject to further insure compensation was provided victims of automobile accidents; it required uninsured motorists coverage be offered in every automobile liability insurance policy for vehicles registered in this state. [Citation omitted.] The obvious legislative purpose in mandating the offer of uninsured motorist coverage was to correct flaws in the [S]afety [R]eponsibility Act. That coverage was designed to compensate innocent persons injured through the wrongful conduct of uninsured motorists who were unable to financially respond in damages. [Citation omitted.] As remedial legislation, it was liberally construed to provide the intended protection. [Citation omitted.] [The 1974 version of KAIRA] repealed the Motor Vehicle Safety Responsibility Act and expresses again the legislative objective of correcting the inadequacies in compensating persons in the operation, maintenance and use of motor vehicles. The innovative scheme selected—no-fault insurance—requires a motor vehicle owner to carry self-protecting insurance." 214 Kan. at 605-06.

See also Note, *Kansas Automobile Insurance: Current Issues and Problems,* 29 Washburn L.J. 600 (1990) (historical overview of vehicle insurance in Kansas and discussion of KAIRA); Note, *No-Fault Automobile Insurance: An Analysis of the Kansas Automobile Injury Reparations Act,* 20 Washburn L.J. 375 (1981) (same).

There is no doubt the legislature intended KAIRA to protect the public and to provide compensation. Does it follow that in protecting the public, the legislature also intended owners to be liable for the negligent acts of permissive drivers?

Hicks Brothers' argument that KAIRA mandates liability coverage, not liability, is persuasive. The *liability imposed by law* language of K.S.A. 40-3107 is more supportive of Hicks Brothers' position than West's. The vast majority of jurisdictions would require a showing of negligence on Hicks Brothers' part in order to find the dealer liable. If such a drastic change in liability is to be made, as suggested by West, it should be made by the legislature. We hold that liability of the owner of a vehicle involved in an accident while being driven by a permissive driver must be determined under tort theories such as negligent en-

trustment, and vicarious liability will not be imputed to a vehicle owner based solely on permissive use by a third party.

Judgments of the Court of Appeals and the district court are affirmed.