No. 100,215

Tom Bates and Michelle Entriken, as Parents and Next Friends of Hayley Bates, a Minor, *Appellants*, v. Dodge City Healthcare Group, L.P., d/b/a Western Plains Regional Hospital, *Appellee*.

(291 P.3d 1042)

Opinion filed January 11, 2013.

*Bradley A. Levin*, of Roberts Levin Rosenberg PC, of Denver, Colorado, argued the cause, and *Jeremy A. Sitcoff*, of the same firm, *Bradley J. Prochaska* and *James R. Howell*, of Prochaska, Craig, Giroux & Howell, of Wichita, and *James Leventhal* and *Isobel Thomas*, of Leventhal Brown & Puga, P.C., of Denver, Colorado, were with him on the briefs for appellant.

*Stephen J. Rodolf*, of Rodolf & Todd, of Tulsa, Oklahoma, argued the cause, and *Leslie C. Weeks* and *Charles H. Moody, Jr.*, of the same firm, *John H. Gibson*, of Gilliland & Hayes, PA, of Wichita, and *Bradley C. Ralph*, of Williams, Strobel, Malone & Ralph, P.A., of Dodge City, were with him on the briefs for appellee.

The opinion of the court was delivered by

NUSS, C.J.: This is a case about instructing the jury in a medical malpractice action. Tom Bates and Michelle Entriken, individually and on behalf of their daughter, Hayley Bates, allege obstetrical nurse Linda Unruh breached the standard of care which caused permanent injury to Hayley. For Unruh's purported negligence, the parents sued her employer, Dodge City Healthcare Group, L.P. d/b/a Western Plains Regional Hospital (hospital) under respondeat superior. The jury returned a verdict for the hospital, and the parents appealed a number of issues.

After the Court of Appeals affirmed, we granted the parents' petition for review under K.S.A. 20-3018(b) on one issue. We must decide if under the facts of this case it was proper for the jury to

receive the stock instruction of PIK Civ. 3d 123.01. It states Unruh's duty as nurse was to use "that degree of learning and skill ordinarily possessed and used by members of that profession *in the community in which she practices, or in similar communities.*" (Emphasis added.)

The parents contend this instruction—No. 9—erroneously directed the jury to apply a "community" nursing standard of care when all 12 of their negligence claims were governed by a national standard. The hospital concedes that 11 claims were governed by a national standard. But it argues Instruction No. 9 was nevertheless proper because the parents' remaining claim of negligence—alleging Unruh's failure to activate and timely follow through on her medical "chain of command"—was governed by a community standard of care.

For several reasons, we affirm the lower courts.

## FACTS

Because the 5-week jury trial spawned only one issue on appeal to this court, our factual recitation will be limited to some background facts and those deemed necessary to resolve that single issue. Michelle Entriken is an insulin dependent diabetic. On December 20, 1996, she awoke in pain at 5 a.m. Because Michelle was between 34 and 35 weeks pregnant, she believed she was in labor. After being driven to Western Plains Regional Hospital in Dodge City, she went straight to the obstetrical department. According to her testimony, she arrived at around 6:25 a.m. But the hospital records show her departmental admission at 7:20 a.m.—almost 1 hour later.

In the obstetrical department Michelle met with Linda Unruh, who has been a labor and delivery nurse for 33 years. Unruh helped Michelle into a hospital gown, obtained a medical history, and started a fetal heart monitor. The fetal heart rate was within normal parameters for a baseline. The rate also had good variability, a term which applies to the fluctuations in the heart. According to the evidence, these are signs of fetal well-being.

Unruh testified that at 7:40 a.m. she called Michelle's obstetrician, Dr. Anupong Chotimongkol. According to Unruh, she in-

formed the doctor that Michelle was at the hospital. She also told him Michelle was having preterm contractions and that she was diabetic, in much pain, and had a sterile vaginal exam. Dr. Chotimongkol ordered an IV, pain medication as necessary, and admitted Michelle to the hospital for observation.

Two minutes later, at 7:42 a.m., "prolonged decelerations to [the] fetal heart rate" began. According to the evidence, deceleration can cause insufficient blood flow to the fetus' brain, which in turn compromises the fetus' oxygen supply. The parents were to later allege the decelerations are a symptom of a placental abruption that actually began compromising the fetus. Unruh then turned Michelle on her left side, started her on oxygen, and raised her feet higher than her head.

At 8:10 a.m., Unruh called Dr. Chotimongkol a second time. She told the doctor about difficulty with the fetal heart tones and the decelerations. She also said she had been unable to start the IV and that Michelle had a tense uterus. According to Unruh, she asked Dr. Chotimongkol, who lived 5 to 10 minutes away, to come to the hospital. The doctor then ordered a sonogram "stat," i.e., to be performed immediately. Unruh testified that in her experience, Dr. Chotimongkol responded promptly when asked to come to the hospital.

By 8:20 a.m. Dr. Chotimongkol had not arrived, so Unruh paged him "stat," which meant he should come immediately. At 8:38 a.m. Dr. Chotimongkol arrived and ordered an immediate C-section to be performed. At 9:11 a.m. Hayley was delivered.

Hayley did not breathe during her first 5 minutes after birth. She was flown to Wesley Medical Center in Wichita, where she spent 1 month in the neonatal intensive care unit. Hayley has been diagnosed with cerebral palsy; she has severe spastic quadriplegia with a seizure disorder. The evidence reveals her condition is unlikely to improve.

The parents sued only the Dodge City hospital, alleging that under respondeat superior the hospital was vicariously responsible for the negligence of its employee, Unruh. The parents ultimately alleged Unruh breached the nursing standard of care owed to a patient by failing to:

(1) promptly assess Michelle and her unborn child when Michelle presented to the hospital;

(2) accurately interpret the fetal heart tracings;

(3) obtain an adequate fetal heart tracing;

(4) provide appropriate nursing interventions in a timely manner;

(5) accurately inform Dr. Chotimongkol of Michelle's condition and the condition of her fetus;

(6) recognize the signs and symptoms of placental insufficiency and/or placental abruption;

(7) *activate the chain of command and timely and appropriately contact her supervisor and the C-section team while waiting for Dr. Chotimongkol to arrive;*

(8) communicate timely with Dr. Chotimongkol regarding Michelle's and Hayley's signs and symptoms;

(9) be in Michelle's room to monitor her and her unborn baby from 7:40 a.m. to 8 a.m.;

(10) communicate to Dr. Chotimongkol at 7:40 a.m. that he was needed in the hospital on an urgent basis;

(11) follow the hospital's own policies and procedures; and

(12) see and evaluate Michelle at the time she arrived at the hospital at approximately 6:30 a.m., and not seeing her until 7:20 a.m. (Emphasis added.)

At the heart of this appeal is the claim that Unruh failed to activate and timely follow through on her medical chain of command, *e.g.*, allegation of negligence number 7 above.

*The Expert Testimony on the Standard of Care:*

At least five expert witnesses testified about the nursing standard of care—three for the parents and two for the hospital.

The first expert witness for the parents was Linda Chagnon, a registered nurse and the Director of Women's Services at Overlake Hospital Medical Center in Bellevue, Washington. Her hospital contains 320 to 340 beds. Chagnon testified about the existence of a national standard of care for a labor and delivery nurse, which means a patient should be cared for in the same manner whether having a baby in Bellevue, Washington, or Florida.

Chagnon also testified that she and Unruh both were members of the Association of Women's Health Obstetric and Neonatal Nursing (AWHONN), and the AWHONN nursing standard applies whether the nurse works in Dodge City, Seattle, Tampa, or Tulsa. She further testified Unruh breached that standard by failing to perform numerous tasks between the time she checked Michelle into the labor and delivery unit until Dr. Chotimongkol arrived and ordered an emergency C-section.

According to Chagnon, the standard of care required that Unruh call Dr. Chotimongkol at 7:42 a.m. when the decelerations to the fetal heart rate began. She testified that if Dr. Chotimongkol "doesn't come in, then you go up your chain of command. You go to your supervisor, your manager, whoever was there that day." This eventually would have included the chief of medical staff for the hospital. She specifically testified that Unruh's failure to execute the chain of command was substandard care. Prior to Chagnon's testimony, Unruh had testified that she did not try to see if there was any other doctor available to deliver Michelle's baby because she expected Dr. Chotimongkol to come to the hospital.

The second expert witness for the parents was Dr. Reid Goodman, an obstetrician-gynecologist from Denver, Colorado. He testified that even though he is a physician, he was familiar with, and qualified to testify about, the nursing standard of care, because he "lives it."

According to Dr. Goodman, the standard of care "for a nurse notifying the physician" was the same whether the nurse worked in Denver or Dodge City. He testified that the size of the community did not matter because "if you offer obstetric services then you are bound to uphold the standard for providing obstetric services." Regarding the issue of chain of command, Goodman testified that Unruh breached the standard of care because she failed to find another surgeon to perform the C-section after Dr. Chotimongkol did not promptly arrive. He further testified that Unruh should have prepped Michelle for surgery while waiting on the doctor to arrive. According to Dr. Chotimongkol, when he arrived Michelle was undergoing the sonogram he had ordered. He looked

at the sonogram and then made the "split-second" decision to order the C-section.

On cross-examination, Dr. Goodman admitted that the Dodge City hospital was different than his hospital in Denver which has 100 obstetricians on staff because the Western Plains Regional Hospital only has two. He agreed that the likelihood of finding someone available at any given moment at his hospital is much greater than at the Dodge City hospital. He also admitted that the small community hospitals cannot always do the same things that a large hospital can do.

The parents' third expert witness was Michelle Murray, a nurse from Albuquerque, New Mexico, who teaches at nursing seminars throughout the country. Murray testified about the existence of a national standard of care for labor and delivery nurses. According to her, whether the nurse is in Dodge City, Denver, Kansas City, or Wichita does not matter because "it's basically what a reasonable nurse would do in a similar situation. We're not asking for the highest level of practice. We're just saying what's reasonable, and that's the way it should be nationally." Regarding the issue of chain of command, Murray testified that once Unruh learned that Dr. Chotimongkol was unable or unwilling to perform an immediate C-section, Unruh had a responsibility to "call the chain of command and to find a physician who would respond properly." In Murray's expert opinion, Unruh's failure was a breach of her standard of care.

Testifying for the hospital were Mark Donnell Akin, M.D., an obstetrician-gynecologist from Austin, Texas, and Susie Lye, R.N., a labor and delivery nurse from Tulsa, Oklahoma. According to Dr. Akin, the basic nursing care standards are the same regardless of location. But he testified that "we cannot expect certain things to be the same in a very small world hospital as compared to a large city hospital." He testified that the biggest difference was "[m]ostly availability of resources of specialists that might be immediately available." Dr. Akin further testified that Unruh met the standard of care, *e.g.*, she acted appropriately in how and when she communicated with Dr. Chotimongkol.

Nurse Lye also testified that national standards of care exist for labor and delivery nurses because there are things that should be done regardless of location. She testified that the national standard applies to things such as interpreting fetal monitor tracings, performing an admission assessment, general patient monitoring, and communicating with physicians. But according to Lye, there are "slight differences in care . . . depending on what size of a hospital you're in." Some options may not be available to the nurse if, for example, the hospital did not have a neonatal intensive care unit. She testified that Unruh met the standard of care.

*The Jury Instructions Conference:*

During the jury instructions conference, counsel for the parents and the hospital disputed whether the standard of care instructions should include the "same community" or "similar communities" language, *i.e.*, establishing a local standard of care. This dispute included the PIK Civ. 3d 123.01 instruction to define the standard of care governing Unruh's conduct. This eventually became Instruction No. 9.

The hospital argued that the stock PIK Civ. 3d 123.01 instruction should retain its "same community" and "similar communities" language because the claim regarding the chain of command was governed by a community standard, not a national one. But the hospital admitted the parties agreed a national standard of care applied to the "fetal monitoring and general nursing care." The stock instruction provides:

"In performing professional services for a patient, a nurse has a duty to use that degree of learning and skill ordinarily possessed and used *by members of that profession in the community in which she practices, or in similar communities,* under like circumstances. In the application of this skill and learning the nurse should also use ordinary care and diligence. A violation of this duty is negligence." (Emphasis added.)

The parents' counsel in turn argued the stock PIK instruction should be modified to delete the community language. He argued all 12 of the claims were governed by a national standard of care, and none of the expert witnesses came from Dodge City or a community of similar size.

The district court held that a national standard applied so it deleted the community language from the stock PIK instruction defining Unruh's duty.

At one stage the hospital had argued that the community language should be included for the chain of command claim as follows:

"So this testimony from these witnesses about chain of command and here's what needs to be done, they've never been in Western Plains Regional Hospital. They have no idea what goes on there. None. The only person that has ever been by the hospital was Dr. Akin [defense expert witness]. The rest of these experts have no idea. *And that's what is so concerning to me is that they have heard from these witnesses, from Michelle Murray* [the parents' expert witness], *and all of these other people, that it's just lickety-split, you could pick up the phone and using the chain of command and another OB* [obstetrician] *would vaporize right there and would appear and be able to handle this patient. That's not the way it happened in Dodge City at Western Plains Regional Hospital. As so this community—I don't want to say standard—but the community and how this hospital operates within the community is very important in this case.*

"And we are not going to stand up here in front of this jury and say that because it's in Dodge City Linda Unruh had any less of an obligation to provide care to Michelle Entriken, but *her ability to provide the care* that has been suggested by plaintiff's experts is just not there. *And that would allow them to stand up and make the arguments that . . . chain of command just could've materialized an OB* [obstetrician] *just like that, and that's just not the way it happens."* (Emphasis added.)

The next day, however, the court restored the community language to the nurse's standard of care instruction (stock PIK Civ. 3d 123.01) because of the chain of command issue. The court referenced the PIK Notes on Use which state:

"*When it is agreed* that the standard of medical procedure is universal, *consideration should be given to deleting reference to 'similar communities'* as it may be confusing to jurors who hear experts from other states or areas testify. If the standard is universal, the jury should not be concerned with using geography as a criterion for comparison of standard of practice." (Emphasis added.) PIK Civ. 3d 123.01, Notes on Use.

The judge then explained the reason he was restoring the community language was based upon expert witness testimony:

"[W]hile the PIK notes do say where there is an *agreement*, obviously counsel are in *dis*agreement on the matter. I would look more to what the experts have said

to determine whether or not there has been an agreement. I think to some degree there is general agreement among the experts. However, one point was made . . . that causes me to believe that the disagreements may be more than tactical, and that's . . . referring to the issue of instituting chain of command." (Emphasis added.)

The judge continued his explanation of the community language restoration to the instruction by emphasizing physician availability at the hospital:

"As I thought about it last night, I remembered that evidence has been presented to the jury suggesting strongly that . . . *had chain of command been initiated, another physician could have been brought in immediately. That there was, in fact, another physician immediately available. That there should have been a physician immediately available if not.* Those things are issues I think of material disagreement . . . between the parties. Therefore, we will stick to the standard PIK Instruction on this matter as submitted with by the community." (Emphasis added.)

The parents' counsel responded that the court's prior ruling deleting the community language

"was absolutely correct. Everyone came in and said it was the same standard of care. Every single witness said that . . . . [E]ven if you took this in the light most favorable to the defense, Nurse Lye [defense expert witness] didn't differentiate even on the chain of command issue. Dr. Akin [defense expert witness] didn't differentiate even on the chain of command issue."

But counsel argued that even if those witnesses did differentiate, the court should craft a separate instruction on the standard of care to include the community language exclusively for the chain of command issue.

The hospital's counsel conceded that on things such as "the issues of the nurse's [competence] and what would be expected of a reasonably well-trained nurse in interpreting the fetal monitoring and part of the fetal assessment[] [a]ll experts are in agreement. That standard is such that it doesn't matter whether you are in New York City or Dodge City." He proceeded to say, however:

"But on the issue of chain of command, it was clear that pertains to available resources, and those would defer. And the dependency of whether or not the hospital met the standard of care with respect to available resources on the chain of command would depend on the same or similar communities."

The court noted the opposing arguments and declined to issue a separate instruction on the nursing standard of care.

*The Jury Instructions As Issued:*

The final version of jury Instruction No. 9 regarding Unruh's standard of care was an unmodified PIK Civ. 3d 123.01 instruction and read as previously noted.

Although Dr. Chotimongkol was not a party, his standard of care was defined almost identically for purposes of comparing his fault to Unruh's (and the hospital's under respondeat superior) under K.S.A. 60-258a. The final version of Instruction No. 10 regarding his physician standard of care was also an unmodified PIK Civ. 3d 123.01 instruction. It provided:

"In performing professional services for a patient, a physician has a duty to use that degree of learning and skill ordinarily possessed and used *by members of that profession in the community in which he practices, or in similar communities,* and under like circumstances. In the application of this skill and learning, the physician should also use ordinary care and diligence. A violation of this duty is negligence." (Emphasis added.)

During the parties' closing arguments to the jury at the end of the 5-week trial, the parents' counsel was the only one to reference Instruction No. 9 defining Unruh's standard of care. During his rebuttal portion he essentially argued that the community standard and the national standard were the same:

"There is another instruction that talks about a nurse's duty, and that's instruction number nine, and I want to go over this with you briefly. This talks about a nurse has a duty to use that degree of learning [and] skill ordinarily possessed and used by members of that profession in the community in which he practices or similar communities under like circumstances. You heard everybody, every witness tell you, that the standard is a national standard. And that's how that is read."

*Verdict and Posttrial Motions:*

The jury unanimously found that no fault existed. The hospital was not vicariously at fault under respondeat superior for any Unruh negligence. And although Dr. Chotimongkol was not a defendant, he too was cleared for comparative fault purposes.

After jury polling confirmed the verdict, the parents filed a motion for new trial. They alleged, among other things, the district

court erred by instructing the jury that Unruh's conduct was to be measured by a community standard of care. They argued there was no evidence at trial that the standard of care in Dodge City was different than the national standard. The court denied the motion for new trial.

The Court of Appeals affirmed. Regarding the restoration of the community language in Instruction No. 9, the panel held that the testimony was virtually unanimous that a national standard applied, except for some testimony concerning the availability of resources. So no error occurred in issuing the instruction. *Bates v. Dodge City Healthcare Group*, No. 100,215, 2009 WL 2595926, at *2 (Kan. App. 2009) (unpublished opinion).

We granted the parents' petition for review on the sole issue of whether the district court erred by issuing as Instruction No. 9 the stock instruction from PIK Civ. 3d 123.01 which defined the nursing standard of care as community-based.

Additional facts will be added as necessary to our analysis.

## ANALYSIS

Issue: *Instruction No. 9 was a correct statement of the law under the facts of this case.*

### *Standard of Review*

The parents argue that Instruction No. 9 was incorrect. In analyzing a jury instruction issue on appeal, we implement a stair-step process. As we recently explained in *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012):

"For jury instruction issues, the progression of analysis and corresponding standards of review on appeal are: (1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012)."

*Discussion*

For step one of the *Plummer* analysis, we note the parents objected to Instruction No. 9 at the trial court which preserves the issue for our review. In moving to steps two and three, we further note that that trial courts are required to give an instruction supporting a party's theory if "the instruction is requested and there is evidence supporting the theory which, if accepted as true and viewed in the light most favorable to the requesting party, *is sufficient for reasonable minds to reach different conclusions based on the evidence."* (Emphasis added.) *Puckett v. Mt. Carmel Regional Med. Center*, 290 Kan. 406, 419, 228 P.3d 1048 (2010).

Continuing with steps two and three, particularly determining whether the instruction is legally appropriate, we acknowledge that the elements to establish a claim for medical malpractice include, among other things: (1) the health care provider owes the patient a duty of care, which obligated the provider to meet or exceed a certain standard of care to protect the patient from injury; and (2) the health care provider breached that duty or deviated from the standard of care. *Puckett*, 290 Kan. 406, Syl. ¶ 5; see also *Wozniak v. Lipoff*, 242 Kan. 583, 587, 750 P.2d 971 (1988) (Proof of malpractice requires two evidentiary steps. It requires evidence as to the recognized standards of the medical community in the particular kind of case, and a showing that the health care provider in question negligently departed from the standard in treating the patient.).

The parents attack this first element of medical malpractice identified in *Puckett*. More specifically, they argue that Instruction No. 9 was incorrect because it informed the jury that Unruh's conduct should be judged by standards of care from Dodge City or a similar community, *i.e.*, as they frame it, from a small town hospital. They contend the instruction instead should have contained a national standard of care and because this error could have reasonably misled the jury, reversal and remand for a new trial is required.

The hospital responds that the jury was properly instructed under the stock instruction from PIK Civ. 3d 123.01, and, if not, any error was harmless.

In affirming the district court's retention of the community standard in Instruction No. 9, the Court of Appeals panel specifically held:

"The expert testimony was nearly unanimous that the basic standard of care for labor/delivery nurses was a national/universal one. But there was some testimony that with respect to things such as availability of resources (certain texts, equipment, or the number of doctors available) there would be variations based on the size of the hospital or the community. [Consequently,] [w]e cannot conclude the instruction as given would have *reasonably misled* the jury." (Emphasis added.) *Bates*, 2009 WL 2595926, at *2.

The italicized language suggests the panel used a harmless error standard of review contained in its earlier citation of *Wood v. Groh*, 269 Kan. 420, 423-24, 7 P.3d 1163 (2000) (Errors regarding instruction will not require reversal unless they result in prejudice to the appealing party. Where the instructions as a whole fairly instruct the jury on the law governing the case and are substantially correct and could not reasonably mislead the jury, the instructions will be approved.). This approach is greatly clarified by *Plummer*'s progression of analysis and corresponding standards of review.

Moreover, the panel's analysis and holding do not address the specifics of some of the arguments the parents and the hospital repeat before this court. More particularly, the parents argue that Instruction No. 9's mention of a community standard of care was erroneous because all 12 of their negligence claims were governed by a national standard. As for the hospital, it concedes that 11 claims were governed by a national standard. But it argues Instruction No. 9 was nevertheless proper because the parents' remaining claim of negligence—alleging Unruh's failure to activate and timely follow through on her medical chain of command—was governed by a community standard of care.

As analyzed in more detail below, we agree with the hospital for several reasons. First, when accepted as true and viewed in the light most favorable to the hospital, there was expert testimony sufficient for reasonable minds to reach different conclusions based on the evidence. This testimony was therefore sufficient to support an instruction that retained the community standards in PIK Civ. 3d 123.01, particularly regarding the chain of command claim. See

*Plummer*, 295 Kan. 156, Syl. ¶ 1; *Puckett*, 290 Kan. at 419. Second, under this same deferential standard, expert testimony readily established that the overall nursing standards for a jury to evaluate Unruh's conduct in the community of Dodge City were also the national standards of care. In short, Instruction No. 9, which is a verbatim recitation of PIK Civ. 3d 123.01, is an accurate and fair statement of Kansas law under the facts of this case. See *Plummer*, 295 Kan 156, Syl. ¶ 1; *Puckett*, 290 Kan. at 419.

We proceed in our analysis by again quoting PIK Civ. 3d 123.01:

"In performing professional services for a patient, a [nurse] has a duty to use that degree of learning and skill ordinarily possessed and used *by members of that profession . . . in the community in which* [*she*] *practices, or in similar communities,* under like circumstances. In the application of this skill and learning the [nurse] should also use ordinary care and diligence. A violation of this duty is negligence." (Emphasis added.)

Despite the ever increasing use of national standards, PIK recognizes that the community standards, *i.e.*, the locality rule, still can have viability. We recognized this co-existence in *Chandler v. Neosho Memorial Hospital*, 223 Kan. 1, 4, 674 P.2d 136 (1977):

"No doubt many areas of medical practice and hospital care are now standard throughout the United States. In yet other areas of medical practice and hospital care, procedures and treatment may differ because of local preferences and experience, because of altitude and climate, *or because of the availability or lack of equipment, facilities, and staff.* We are not, therefore, prepared to say that national standards apply in every area of health care; but we recognize that some standards may well be of universal application." (Emphasis added.)

As we explained, " '[l]ocality' has to do with population, location, hospital and laboratory facilities, staff, *and the medical practitioners and specialists available.* It is simply one of the factors to be considered" in defining the standard of care. (Emphasis added.) 223 Kan. at 4; see *Avey v. St. Francis Hospital & School of Nursing,* 201 Kan. 687, 694-98, 442 P.2d 1013 (1968).

The Notes on Use to PIK Civ. 3d 123.01 provide that the stock language regarding the community standards can be deleted under certain circumstances. But the district court retained it because the standard of care was not universal or national on the chain of command allegation. Here, although not expressly identified by

that court or the Court of Appeals panel in their rulings, that local factor of the standard of care to be applied in this case's chain of command claim was supported by the expert testimony of Dr. Akin and Nurse Lye on direct examination and on the cross-examination of Dr. Goodman.

Dr. Akin testified that the biggest difference between practicing in New York City versus Dodge City is "mostly availability of resources of specialists that might be immediately available." Nurse Lye testified that "there are slight differences in care . . . depending on what size of hospital you're in" and that smaller hospitals may not have a neonatal intensive care unit. And Dr. Goodman admitted that because his hospital in Denver has 100 obstetricians on staff while the Dodge City hospital only has two, the likelihood of finding someone available at any given moment at his hospital is much greater than at Unruh's. He also admitted that the small community hospitals cannot always do the same things that a large hospital can do.

While there is evidence to the contrary, when evaluated under the *Puckett* standards this testimony is sufficient to support the community standard of care language in Instruction No. 9. Accordingly, the instruction was correct for the negligence allegation based upon chain of command. See *Chandler*, 223 Kan. 1, Syl. ¶ 1 (The standard of medical care which is to be applied in each case is strictly a matter to be established by the testimony of competent medical experts.).

Turning now to the other 11 negligence claims against Unruh, Instruction No. 9 is also correct for them. We begin by observing the hospital concedes that a national standard of care applies to these other 11. And the expert testimony in the record certainly supports this concession. See *Chandler*, 223 Kan. 1, Syl. ¶ 1 (medical care standard to be applied is strictly matter to be established by competent medical expert testimony). As the Court of Appeals panel pointed out: "The expert testimony was nearly unanimous that the basic standard of care for labor/delivery nurses was a national/universal one." *Bates*, 2009 WL 2595926, at *2. Therefore, under the *Puckett* standards, this testimony supported giving a national standard of care instruction on those 11 claims.

We acknowledge Instruction No. 9 does not specify that a national standard of care applies, *e.g.*, to these 11 negligence claims. But based upon the nearly unanimous expert witness testimony, the parties consistently have agreed that the basic standard of care for labor and delivery nurse Unruh—a nurse in Dodge City—was a national or universal one. So the community and national standards were actually the same for these claims.

The parents' counsel himself expressly admitted they were equivalents in one of the last things he said to the jury before their deliberations. He stated in his rebuttal closing argument:

"There is another instruction that talks about a nurse's duty, and that's instruction number nine, and I want to go over this with you briefly. This talks about a nurse has a duty to use that degree of learning [and] skill ordinarily possessed and used by members of that profession *in the community in which he practices or similar communities under like circumstances.*" (Emphasis added.)

Counsel then declared:

"You heard everybody, every witness tell you, that the standard is a national standard. *And that's how that* [community standard instruction] *is read.*" (Emphasis added.)

There was no objection by the hospital's counsel to this equivalency of standards argument, while just two transcript pages earlier he had objected to a different rebuttal argument. There he contended the parents' counsel's assertion "misstated the instructions to the jury," and his objection was sustained by the court. And merely two transcript pages after the parents' counsel had informed the jury members that the expert testimony required the instruction's community standard to be read as the national standard, he also told them to "decide the case on the facts, the rules, the law, and make a determination that makes sense."

The parents' counsel supported his "equivalence" closing argument by essentially telling the jury that only evidence of a national standard had been heard, a theme he argued repeatedly at the district court level. For example, in the instructions conference he had argued, "Everyone came in and said it was the same standard of care. Every single witness said that . . . ." We acknowledge he made this particular statement to argue that the community lan-

guage should have been deleted in Instruction No. 9. But it also demonstrates how the parents' counsel could argue equivalency to the jury without drawing objection by a hospital counsel watching for his opponent's further misstatements of the instructions.

This theme by the parents continued posttrial. They argued in the motion for new trial: "Defendant presented no evidence at trial that the standard of care in Dodge City, Kansas, where Defendant's hospital was located and Nurse Unruh practices, was somehow different than the national standard." Their petition for review to this court argues that both parties' experts "agreed that the applicable standard is universal, *i.e.*, that a national standard applies." And their appellate briefs make similar pronouncements.

Counsel's declaration that the community and national standards are equivalent is also significant to another contention of the parents. Specifically, they contend that the chain of command negligence claim simply did not concern community standards. So Instruction No. 9 should not have contained them. In their view, the chain of command issue did not involve a hospital's available resources, *e.g.*, the availability of 98 or 99 more obstetricians from which one could suddenly "materialize" when summoned. Rather, the issue was one of causation.

For example, when Dr. Chotimongkol did not timely appear, the parents' expert witnesses Dr. Goodman and Nurse Murray would have required Unruh to initiate the chain of command and find another qualified physician. The parents suggest while Unruh failed to activate her chain of command, that nevertheless an actual lack of medical resources—such as the unavailability of another physician in the smaller hospital who could have timely responded had Unruh made the effort—could have meant Hayley's outcome would not have changed. If so, Unruh's breach of duty could not have caused Hayley's damages. See, *e.g.*, *Puckett*, 290 Kan. at 420 (to establish a claim based on medical malpractice, the patient's injury must proximately result from the health care provider's breach of the standard of care). Accordingly, Unruh could not have been at fault, and therefore the hospital could not have been liable under respondeat superior. Acknowledging these possibilities, the parents argue the availability of medical resources is a causation

issue. It is not a community standard of care issue to be addressed in the jury instruction.

But even if the parents are correct, their counsel declared to the jury that the community and national standards are equivalents. Consequently, the presence of community standards language in the instruction makes no difference. We therefore reject this argument.

Finally, the parents argue in the petition for review that the jury was given "conflicting, and thus confusing, instructions" on standards of care. In particular, they appear to point out that unlike Instruction No. 9, the Instruction No. 11 regarding the hospital standard of care did not contain the community language.

Instruction No. 11 was modified from PIK Civ. 3d 123.02 and stated:

"A hospital has a duty to a patient to exercise such reasonable care as the patient's condition may require. The degree of care depends upon the known physical ailments of the patient.

"In matters of a medical or scientific nature, the standard of reasonable care of a hospital is that degree of care, skill and diligence used by hospitals *generally*. The only way that you can properly find a standard is through evidence presented by expert testimony.

"A violation of this duty is negligence." (Emphasis added.)

We disagree that these standard of care instructions were conflicting and confusing, particularly to the extent requiring reversal and remand for new trial as the parents demand. As mentioned, Instruction No. 9, reciting the nurse standard of care, correctly contained the community standard language. Instruction No. 10, reciting the physician standard of care for which the parents do not claim error on appeal, contained the same community standard language. So did Instruction No. 21, which identified the concept of comparative fault of the hospital—through its nurse under respondeat superior—and of nonparty Dr. Chotimongkol. Instruction No. 21 reads as follows :

"This case must be determined on the basis of comparative fault of the party and non party. In deciding the case, you will need to know the meaning of the terms 'negligence' and 'fault.'

"In performing professional services for a patient, a *nurse/physician* has a duty to use that degree of learning and skill ordinarily possessed and used *by members*

*of that profession and of that school of medicine in the community in which the nurse/physician practices,* and under like circumstances. In the application of this skill and learning the nurse/physician should also use ordinary care and diligence. A violation of this duty is negligence.

"A party is at fault when he or she is negligent and that negligence caused or contributed to the event which brought about the injury or damages for which claim is made." (Emphasis added.)

Instruction No. 10 refers entirely to Dr. Chotimongkol to define his standard of care, and Instruction No. 21 refers partly to him as a nonparty. The instructions refer to Dr. Chotimongkol because although he was not a named defendant at the time of trial, the jury verdict form provided that any fault could be allocated among only two entities: (1) the defendant hospital and (2) the nonparty Dr. Chotimongkol, strictly for comparative purposes under K.S.A. 60-258a. See *Anderson v. National Carriers, Inc.*, 10 Kan. App. 2d 203, 207-08, 695 P.2d 1293 (1985) (explaining comparative fault with phantom defendant). So instructions on these two entities' respective standards of care clearly were the touchstone for the jury's consideration of the fact, and amount, of their alleged fault in causing Hayley's injuries.

As for the only named defendant, the parents admit the hospital's sole liability is vicarious, *i.e.*, through respondeat superior because of its nurse's alleged negligence. Their brief expressly concedes: "The hospital's negligence was predicated on Nurse Unruh's negligence." See *West v. Collins*, 251 Kan. 657, 664-65, 840 P.2d 435 (1992) (" 'Vicarious liability is a term generally applied to legal liability which arises solely because of a relationship and not because of any act of negligence by the person held vicariously liable for the act of another.' ").

The parents' admission is consistent with other jury instructions such as No. 6 which directs that the hospital "is a corporation and can act only through its . . . employees. The negligence, if any, of an employee acting within the scope of her employment is the negligence of the corporation" hospital. Likewise, Instruction No. 13 directs that the hospital is "responsible for any act or omission of its nurses . . . . If you find that any of the nurses at [hospital] were negligent, then you must find that the defendant [hospital]

was negligent." Similarly, in Instruction No. 20 the hospital denies liability for negligence claims asserted against it by the parents because its employees did not depart from accepted standards of medical care.

In short, Instruction No. 11 admittedly concerns the hospital standard of care. But Unruh's standard of care in Instruction No. 9, as repeated in No. 21 for comparative fault purposes, is the actual underlying basis of liability for the hospital—not No. 11. Furthermore, the community language contained in Instruction Nos. 9 and 21, while not identical to that found in Instruction No. 11, is not so different as to be confusing and require reversal and remand. The latter requires that hospitals be held to a standard of reasonable care "used by hospitals generally." When considering Instruction No. 11 in the context of the other instructions discussed above, we must affirm the district court and Court of Appeals.

The decision of the Court of Appeals affirming the district court is affirmed. The decision of the district court is affirmed.

MORITZ, J., not participating.

JEROME P. HELLMER, District Judge, assigned.[1]

BILES, J., concurring in part and dissenting in part: I agree with the majority's determination that there was a conflict in the evidence as to whether the local standard of care applied to the parents' negligence allegation based upon the failure to activate the chain of command. And I agree the PIK Civ. 3d 123.01 instruction containing the "similar communities" language was required to be given as to this single claim.

But I would hold that the district court needed to issue the modified instruction requested by the parents, which omitted the community language, because there was an evidentiary dispute over which standard applied. Instead, the jury was given the stock

---

[1]**REPORTER'S NOTE:** District Judge Hellmer was appointed to hear case No. 100,215 vice Justice Moritz pursuant to the authority vested in the Supreme Court by Art. 3, § 6(f) of the Kansas Constitution.

PIK Civ. 3d 123.01 instruction as Instruction No. 9, which did not distinguish between any claims, and stated simply:

"In performing professional services for a patient, a nurse has a duty to use that degree of learning and skill ordinarily possessed and used by members of that profession in the community in which she practices, or in similar communities, under like circumstances. In the application of this skill and learning the nurse should also use ordinary care and diligence. A violation of this duty is negligence."

I further dissent from the majority's determination that Instruction No. 9 was also correct for the parents' remaining 11 claims that the hospital admitted were governed by the national standard of care. I would find reversible error and remand for a new trial.

Regarding the chain of command issue, I agree with the majority's determination that the hospital was entitled to an instruction on the local standard of care for that allegation. As the majority recites, Dr. Akin, Nurse Lye, and Dr. Goodman all presented evidence supporting a local community standard of care for that claim. But I believe this court is also required to determine whether the parents were entitled to an instruction on the national standard of care for that same claim. After all, the parents' threshold argument was that all 12 of the claims were governed by a national standard of care, and the parents presented evidence supportive of that standard as to this claim.

Under the standard of review recited by the majority, "trial courts are required to give an instruction supporting a party's theory if the instruction is requested and there is evidence supporting the theory which, if accepted as true and viewed in the light most favorable to the requesting party, *is sufficient for reasonable minds to reach different conclusions based on the evidence.*" Slip op. at 16-17 (citing *Puckett v. Mt. Carmel Regional Med. Center*, 290 Kan. 406, 419, 228 P.3d 1048 [2010]). The parents asked the district court to delete the "similar communities" language from PIK Civ. 3d 123.01 consistent with the Notes of Use, which state:

"When it is agreed that the standard of medical procedure is universal, consideration should be given to deleting reference to 'similar communities' as it may be confusing to jurors who hear experts from other states or areas testify. If the standard is universal, the jury should not be concerned with using geography as

a criterion for comparison of standard of practice." PIK Civ. 3d 123.01, Notes on Use.

The modified instruction was a legally accurate statement of the national standard of care, and it satisfied the second step of the *Plummer* analysis that we employ for these questions. See *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012). And the majority acknowledges that evidence was admitted at trial through Nurse Chagnon's and Nurse Unruh's testimony that a national standard of care governed the allegation involving the chain of command. This satisfies the third step of our *Plummer* analysis.

The standard of medical or hospital care that is to be applied in any malpractice case is not a rule of law, it is a matter established through expert testimony. *Nold ex rel. Nold v. Binyon*, 272 Kan. 87, 103, 31 P.3d 274 (2001) (citing *Chandler v. Neosho Memorial Hospital*, 223 Kan. 1, 5, 574 P.2d 136 [1977]). Since juries are required to resolve factual disputes, the jury should have been instructed on both standards of care for the chain of command claim and then informed it needed to determine what standard of care applied to that claim. See PIK Civ. 3d 123.12, Notes on Use (if there is an evidentiary dispute as to whether the physician is acting as a specialist, the general physician standard of care instruction and the specialist instruction should be issued with appropriate modification).

The only remaining question under *Plummer* is whether the failure to issue the modified instruction was harmless. And I would hold it is not harmless, especially given what I see as the other error in the majority's analysis of the standard of care instruction issued for the parents' remaining 11 claims, which is even more troubling.

My colleagues and the hospital freely admit that 11 of the parents' 12 claims were governed by a national standard of care. But I do not see where the instruction communicated that standard. As the majority recites: "We acknowledge Instruction No. 9 does not specify that a national standard of care applies, *e.g.*, to [the remaining] 11 negligence claims." And yet, the majority later reads the exact same language in the instruction as being equivalent to

establishing the national standard of care for the remaining claims. The majority cannot have it both ways. The "similar communities" language either established the lower local standard of care, or it did not. And if it communicates the lower standard, it did it for all 12 claims.

In order to reach its result, the majority misappropriates the parents' threshold argument that all 12 claims were governed by a national standard of care as if to pretend that the hospital's position on the chain of command claim did not exist. The majority cites the parents' counsel as stating during rebuttal closing argument that Instruction No. 9 established the national standard of care because "[y]ou heard everybody, every witness tell you, that the standard is a national standard." But this statement went to whether there was an evidentiary dispute and was inaccurate anyway given this court's conclusion that there was evidence also supporting the local standard of care. Counsel's statement does not support the majority's assertion that the same instruction language established both standards of care.

The majority's approach is far better characterized as a harmless error analysis, but I cannot agree to that in this case given the instruction's obvious lack of specificity as to which claim required application of which standard. The parents submitted 12 claims. Eleven were governed by a national standard of care. And there was an evidentiary dispute regarding the standard of care governing the remaining claim, which the jury needed to resolve. But the jury was instructed generally on the lower standard of care, and the instructions were not modified as required to tell it that a higher national standard applied to the vast majority of the parents' claims.

The district court should have issued the modified instruction requested by the parents, in addition to Instruction No. 9. And the jury should have been informed which standard applied to which claim and which claim required it to resolve an evidentiary dispute. I would reverse and remand for a new trial.

ROSEN, J., joins the foregoing concurring and dissenting opinion.