IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 111,671

STACI RUSSELL,
*Appellant*,

v.

LISA MAY, M.D., VICTORIA W. KINDEL, M.D., and
TANA GOERING, M.D.,
*Appellees.*

SYLLABUS BY THE COURT

1.

A party who does not raise an issue in a petition seeking review of a Kansas Court of Appeals decision fails to preserve the issue for review by the Kansas Supreme Court.

2.

On appeal from a decision regarding a motion for judgment as a matter of law under K.S.A. 2016 Supp. 60-260(a), an appellate court applies the same standard as did the district court and reviews the motion de novo. A district court must deny a 60-260(a) motion if evidence exists upon which a jury could properly find a verdict for the nonmoving party. In evaluating the motion, a district court must resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought. Where reasonable minds could reach different conclusions based on the evidence, the motion must be denied.

3.

The plaintiff in a medical malpractice action must prove (1) the health care provider owed the patient a duty of care and was required to meet or exceed a certain

1

standard of care to protect the patient from injury; (2) the provider breached this duty by deviating from the applicable standard of care; (3) the patient was injured; and (4) the injury proximately resulted from the breach of the standard of care.

4.

A physician's legal duty to a patient is a question of law over which we exercise unlimited review. As a matter of law, a legal duty arises with the formation of a physician-patient relationship. Once that relationship is formed, a health care provider owes the patient a duty of care that obligates the provider to meet or exceed a certain standard of care to protect the patient from injury.

5.

The determination of whether a physician-patient relationship exists rests on consent, and where there is no ongoing physician-patient relationship, the physician's express or implied consent to advise or treat the patient is required for the relationship to come into being. If the controlling facts relating to whether a physician-patient relationship existed are undisputed, a question of law arises. If, however, the controlling facts are at issue, the existence of a physician-patient relationship is usually a question of fact for the jury.

6.

The determination of whether a physician-patient relationship has ended depends on the circumstances; in other words, it generally presents a question of fact. Typically, the relationship continues until it is ended by consent of the parties or revocation by dismissal of the physician or until the services of the physician are no longer needed.

7.

The standard of medical care which is to be applied in each case is not a rule of law, but strictly a matter to be established by the testimony of competent medical experts, except where lack of reasonable care is apparent to an average layperson from common knowledge or experience.

8.

In general, proximate cause can be defined as a cause that in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury and without which the injury would not have occurred, the injury being the natural and probable consequence of the wrongful act. Proximate cause has two components: cause in fact and legal causation.

9.

Proving causation in fact requires the plaintiff to submit sufficient evidence from which a jury could conclude that more likely than not, but for defendant's conduct, the plaintiff's injuries would not have occurred.

10.

To prove legal causation, a plaintiff must show that it was foreseeable that a defendant's conduct might create a risk of harm to the plaintiff and that the result of that conduct and contributing causes were foreseeable. The concept of intervening cause relates to legal causation and does not come into play until after causation in fact has been established. Often, an intervening cause is one that actively operates in producing harm to another after the actor's negligent act or omission has been committed. But a force set in motion at an earlier time is an intervening force if it first operates after the actor has lost control of the situation and the actor neither knew nor should have known of its existence at the time of his negligent conduct. An intervening cause absolves a

defendant of liability only if it supersedes the defendant's negligence. In other words, the superseding and intervening cause component breaks the connection between a negligent act and the harm caused. One more factor—foreseeability—must be considered. If the intervening cause is foreseen or might reasonably have been foreseen by the first actor, his or her negligence may be considered the proximate cause, notwithstanding the intervening cause.

11.

While a negligent health care provider is not solely liable for the subsequent negligence of other treating health care providers, he or she may be held comparatively negligent based on his or her own negligence when the subsequent negligence is foreseeable.

12.

Under the facts of this case, the district court erred in granting judgment as a matter of law and the error cannot be deemed harmless.

13.

Under the facts of this case, any error preserved for appeal did not affect the substantial rights of the plaintiff and does not provide a basis for reversing the jury verdict.

Review of the judgment of the Court of Appeals in an unpublished opinion filed October 2, 2015. Appeal from Sedgwick District Court; MARK A. VINING, judge. Opinion filed August 25, 2017. Judgment of the Court of Appeals affirming the district court is affirmed in part and reversed in part. Judgment of the district court is affirmed in part and reversed in part, and the case is remanded.

*Craig Shultz*, of Shultz Law Office, P.A., of Wichita, argued the cause and was on the briefs for appellant.

4

*Lisa A. McPherson*, of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, argued the cause, and *Marcia A. Wood*, of the same firm, was with her on the briefs for appellee Lisa May.

*Mark R. Maloney*, of Hinkle Law Firm LLC, of Wichita, argued the cause, and *G. Andrew Marino*, of Gilliland & Hayes, LLC, of Wichita, was with him on the briefs for appellee Victoria Kindel.

*Gregory S. Young*, of Hinkle Law Firm LLC, of Wichita, argued the cause, and *Brian L. White*, of the same firm, was with him on the briefs for appellee Tana Goering.

The opinion of the court was delivered by

LUCKERT, J.: Staci Russell sued three physicians for their alleged failure to timely diagnose her cancer. During the jury trial, the district court granted a motion for judgment as a matter of law under K.S.A. 2016 Supp. 60-250(a) and dismissed defendant Tana Goering, M.D., who was Russell's primary care physician. The claims against the two remaining defendants—a radiologist and an obstetrician/gynecologist—proceeded to verdict; the jury determined that neither of the remaining defendants was liable for Russell's damages.

On appeal from those trial proceedings, we hold that the district court erred in granting Dr. Goering judgment as a matter of law. Considering the evidence in the light most favorable to Russell, a reasonable jury could have found that Dr. Goering owed a duty to Russell and breached the standard of care and caused harm to Russell. Further, we reject Dr. Goering's argument that any error was harmless, as the jury's verdict determining the two other physicians were not liable for failing to timely diagnose the cancer does not determine the issues relating to Russell's claim against Dr. Goering.

5

We, therefore, remand this case for retrial against Dr. Goering. In doing so, we reject Russell's request to order a retrial regarding the fault of the two other physicians. Under the circumstances of this case, a jury's determination that they were not at fault absolves them of potential liability.

FACTS AND PROCEDURAL HISTORY

In August 2010, Russell was diagnosed with invasive ductal carcinoma that had spread from her breast to her lymph nodes. She later sued three physicians for medical malpractice relating to the medical care she received in 2008 for a breast lump—a lump she contends was the same lump that was diagnosed in 2010 as cancerous.

In 2008, when Russell first discovered a lump in her right breast, she scheduled an appointment with Dr. Goering. Dr. Goering palpated the breast and felt a lump she described as firm and movable. Dr. Goering then ordered a diagnostic mammogram and, if needed, an ultrasound or sonogram.

Lisa May, M.D., a board-certified radiologist, interpreted Russell's mammogram immediately after it was performed. She noted that "[n]o significant masses, calcifications, or other findings are seen in either breast." Nevertheless, because of the palpable lump and because Russell's age and breast characteristics could make a mammogram less reliable, Dr. May ordered a sonogram, which was performed the same day as the mammogram. While Russell remained in the office, Dr. May reviewed the sonogram images and preliminarily concluded the lump was a benign, fatty lobule. Dr. May then physically palpated the lump and performed some additional scanning. Nothing seen or felt in these additional steps changed Dr. May's initial diagnosis. Russell asked whether she required a biopsy, and Dr. May told her she did not. Dr. May

6

instructed Russell to return in five years if nothing changed but to follow up right away with Dr. Goering if Russell noticed any changes in her breasts.

Dr. May's office sent Dr. Goering, as the referring physician, copies of the imaging reports. In part, the written report stated: "The palpable abnormality correlates with a fatty lobule." The report also indicated "[t]here is no sonographic evidence of malignancy." Dr. Goering did not follow up with Russell.

Several months later, Russell saw Victoria Kindel, M.D., a board-certified obstetrician/gynecologist for a routine well-woman exam. Russell testified, "I told Dr. Kindel that I had found the lump in August. And that I had gone for a mammogram and ultrasound. And Dr. May didn't think it was anything to worry about." During cross-examination, Russell specified that she told Dr. Kindel the lump was benign:

"Q: [I]s it true that you told Dr. Kindel that you had done this mammogram, and that it was reported to you, between that and the ultrasound, as being benign.
"A: Yes.
"Q: Or no cancer?
"A: Yes."

Dr. Kindel, who did not receive a copy of Dr. May's report, testified that Russell reported the results of the mammogram were benign and she relied on Russell's oral report. Dr. Kindel, however, did palpate the lump as part of her exam. She described her finding to the jury: "Right breast inspection normal palpation, size two by two centimeters, mass is mobile and nontender. Nipples normal, no nipple discharge." Dr. Kindel did not find the lump clinically suspicious. Nevertheless, Dr. Kindel suggested to Russell that if she continued to feel anxious, Russell should see a surgeon for a biopsy. Dr. Kindel provided the names and telephone numbers of two surgeons she

7

recommended for a biopsy. Dr. Kindel did not insist Russell seek follow-up care, and Russell did not contact either surgeon.

One year later, Russell again saw Dr. Kindel for her annual, routine well-woman exam. Dr. Kindel examined Russell's breasts, noting a "fullness" in the 10 o'clock position of the same breast where the lump had previously been reported. The parties dispute whether Dr. Kindel encouraged Russell to visit Dr. Goering for a follow-up mammogram if she remained concerned.

Russell noticed the lump began to grow in the summer of 2010. She then called Dr. Goering's office and spoke with Dr. Goering's nurse. Dr. Goering, who had not had any contact with Russell over the two-year period, ordered diagnostic testing. Another radiologist in Dr. May's practice group biopsied the lump, leading to the diagnosis of invasive ductal carcinoma. Dr. Goering's nurse contacted Russell with the diagnosis and referred Russell to a physician for treatment. Eventually, Russell went to M.D. Anderson, a cancer center in Houston. Russell's treatment included chemotherapy, a total mastectomy with auxiliary lymph node dissection, and post-mastectomy radiation. Russell's treating physician at M.D. Anderson estimated there was a better than 90% chance Russell's cancer was completely eradicated.

After Russell filed suit against Drs. Goering, May, and Kindel and the parties conducted discovery, the district court entered a pretrial order setting out Russell's allegations against each of the physicians. Subsequently, each physician filed a motion for summary judgment. The district court granted partial summary judgment to both Drs. Goering and Kindel. After those orders, only one allegation remained against Drs. Goering and Kindel:  They had failed "to recommend biopsy or additional, timely evaluation, even in the face of a reported normal imaging study." The order listed 13 contentions of negligence against Dr. May.

8

After Russell's case-in-chief, each of the physicians asked for judgment as a matter of law under K.S.A. 2016 Supp. 60-250(a). The district court denied the motions of Drs. Kindel and May but granted Dr. Goering's motion and dismissed her from the lawsuit. The trial continued on the claims made against Drs. May and Kindel. Ultimately, the jury returned a verdict that found neither Dr. May nor Dr. Kindel at fault for denying Russell a substantial chance for better recovery or long-term survival.

Focusing on the facts that relate to Dr. Goering's motion for judgment as a matter of law, Russell had presented expert testimony from Dr. James Edney, a surgical oncologist. Dr. Edney described some of the different conditions that may be felt during a breast examination. He compared a lipoma, a benign fatty tumor, which would feel soft like the fleshy part of a hand, with cancer, which would feel hard like a knuckle. Dr. Edney testified that Dr. Goering breached the standard of care because she should have recognized that Dr. May's diagnosis of a fatty lobule was inconsistent with Dr. Goering's physical examination, in which she had felt a firm lump. According to Dr. Edney's direct testimony, the inconsistency required Dr. Goering to act:  to either immediately arrange a biopsy or to schedule a follow-up visit to determine whether the lump remained after a period of two to three months. If the lump persisted and was still detectable after that period, in Dr. Edney's opinion, Dr. Goering should have ordered a biopsy to determine whether the lump was cancerous. Russell also submitted into evidence a learned treatise that supported Dr. Edney's conclusion that follow-up was required. As we will discuss in more detail, Dr. Edney's answers on cross-examination somewhat altered the opinions he had given on direct examination.

The district court did not find this evidence sufficient to meet Russell's burden of proof. The court reasoned there was no duty for Dr. Goering to follow up with Russell "after receipt of a report that shows that there is a benign or nonmalignant finding on a

9

matter that's been sent for investigation." The district judge also found "no expert opinion established that Defendant Goering departed from the standard of care by failing to order a biopsy," and that "a one-time visit to a doctor does not establish a requirement that the doctor call a patient and check up on their wellness."

Russell appealed to the Court of Appeals, raising three issues. She argued the district court erred: (1) in granting Dr. Goering's motion for judgment as a matter of law, (2) in denying Russell's motion to strike responses by Dr. May's expert witness to two cross-examination questions, and (3) in declining to give Russell's proposed jury instruction regarding reliance on medical literature to determine the applicable standard of care. The Court of Appeals rejected each of Russell's arguments. *Russell v. May*, No. 111,671, 2015 WL 5750546 (Kan. App. 2015) (unpublished opinion).

In addressing the dismissal of Dr. Goering as a matter of law, the Court of Appeals conducted a de novo review that shifted the focus away from the questions addressed by the district court—the questions of whether Russell had established that Dr. Goering owed her a duty of care and had breached that duty. The Court of Appeals instead examined whether, even if a duty had been breached, Russell had established a causal link between that breach of duty and any harm. See *Russell*, 2015 WL 5750546, at *3-4. The Court of Appeals emphasized Russell's well-woman care with Dr. Kindel, in which Dr. Kindel found no cause for additional testing, and concluded:

"Based on this fact scenario, no reasonable juror could have come to the conclusion that Dr. Goering's failure to instruct Russell to return for a follow-up office visit after the mammogram and ultrasound caused or contributed to any delay in the treatment of Russell's breast cancer. Had Dr. Goering insisted on seeing Russell within 3 months following these diagnostic tests, there is no evidence the outcome from Russell's care would have been any different. After the initial diagnostic tests, each time Dr. Kindel examined Russell's breasts in February 2009 and again in February 2010, she

10

found no cause for additional diagnostic testing. Even if Dr. Goering should have instructed Russell to seek follow-up care and failed to do so, Russell nevertheless did receive that follow-up care from Dr. Kindel, her OB/GYN." *Russell*, 2015 WL 5750546, at *4.

In discussing the testimony provided by Dr. May's expert, the Court of Appeals determined the district court had not abused its discretion in denying Russell's motion to strike the expert's answers. Russell had first pointed to an exchange in which her counsel asked the expert if a radiologist had any duty to talk to her patient about the results of imaging studies. The expert replied, "No. Standard of care says it goes to the primary care doctor." In answering another question, the expert stated: "[O]nce the imaging studies are normal, the burden then falls normally on the primary care doctor that communicates with the patient." Russell argued Dr. May's expert testified to Dr. Goering's standard of care even though the expert had not disclosed any such opinions during discovery. The Court of Appeals concluded that these answers, when considered in context, were not an attempt to shift liability to Dr. Goering. The court found it significant that Dr. May's expert "did not testify that Dr. Goering, who had previously been dismissed from the suit, should have followed up with Russell or that Dr. Goering's performance fell below the standard of professional care that applied to her." 2015 WL 5750546, at *6. Given that, the Court of Appeals concluded there was "no reasonable basis upon which any reasonable juror hearing this testimony would have concluded that Dr. Goering must have been to some degree at fault in causing Russell's delayed diagnosis." *Russell*, 2015 WL 5750546, at *6.

The Court of Appeals also rejected Russell's arguments about her proposed jury instruction regarding reliance on a medical treatise. The court noted that the treatise had been introduced during Dr. Edney's testimony and the district court had instructed the jury to "consider and weigh" the admitted evidence, which would have included the

11

medical treatise. The court concluded any additional instruction would have unduly emphasized one type of evidence and the district court did not err in refusing to give the instruction. See *Russell*, 2015 WL 5750546, at *7-8.

Russell filed a petition for review, which this court granted.

ANALYSIS

Russell asks this court to review "the decision of the Court of Appeals denying plaintiff's appeal from the trial court's granting of defendant Tana Goering, M.D.'s motion for judgment as a matter of law at the close of the plaintiff's evidence and the decision of the Court of Appeals denying a new trial against *all* defendants." (Emphasis added.) As part of those arguments, she discusses the ruling dismissing Dr. Goering and the district court's decision not to strike the answers of Dr. May's expert, in which the expert said the primary physician generally has the duty to communicate test results to a patient. Russell, however, has not raised her earlier jury instruction issue in either her petition for review or her supplemental brief before this court. As such, she has failed to preserve that issue for our review. See Kansas Supreme Court Rule 8.03(a)(4)(C) (2017 Kan. S. Ct. R. 54) ("'The court will not consider issues not presented or fairly included in the petition.'"); *Sperry v. McKune*, 305 Kan. 469, 487, 384 P.3d 1003 (2016).

1. *The district court erred in granting Dr. Goering's motion.*

We begin our analysis of the preserved issues with the question of whether the district court erred in granting Dr. Goering's motion for judgment as a matter of law under K.S.A. 2016 Supp. 60-250(a). On appeal from a motion for judgment as a matter of law, appellate courts apply the same standard as did the district court and review the motion de novo. *Bussman v. Safeco Ins. Co. of America*, 298 Kan. 700, 707, 317 P.3d 70

12

(2014) (discussing a motion for directed verdict, the former name for a motion for judgment as a matter of law).

The legal standard for granting a motion for judgment as a matter of law required the district court to consider whether Russell had presented sufficient evidence on which a jury could have found Dr. Goering liable for Russell's injuries. See *Smith v. Kansas Gas Service Co.*, 285 Kan. 33, 40, 169 P.3d 1052 (2007) ("[A] motion for judgment as a matter of law must be denied when evidence exists upon which a jury could properly find a verdict for the nonmoving party."). In evaluating whether Russell met this standard, the district court was required to "resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought. Where reasonable minds could reach different conclusions based on the evidence, the motion must be denied." *Bussman*, 298 Kan. at 706-07.

We have explained this standard means "that every material fact which the plaintiff's evidence tended to prove must be taken as true, giving it the most favorable inferences, and disregarding that unfavorable." *Mathes v. Robinson*, 205 Kan. 402, 403, 469 P.2d 259 (1970). Stated another way, it is only if

> "no evidence is presented on a particular issue, or the evidence presented is undisputed and it is such that the minds of reasonable persons may not draw differing inferences and arrive at opposing conclusions with reason and justice, [that] the matter becomes a question of law for the court's determination." *Sampson v. Hunt*, 233 Kan. 572, 578, 665 P.2d 743 (1983).

We necessarily begin our evaluation of whether a jury could return a verdict against Dr. Goering in favor of Russell by examining the elements of Russell's medical malpractice claim against Dr. Goering. Russell needed to establish:

13

"(1) The health care provider owed the patient a duty of care and was required to meet or exceed a certain standard of care to protect the patient from injury; (2) the provider breached this duty or deviated from the applicable standard of care; (3) the patient was injured; and (4) the injury proximately resulted from the breach of the standard of care." *Drouhard-Nordhus v. Rosenquist*, 301 Kan. 618, 623, 345 P.3d 281 (2015).

In this case, the district court granted judgment as a matter of law on the basis that Dr. Goering neither owed nor breached her duty—even though Dr. Goering had focused her arguments on causation. The Court of Appeals, by contrast, adopted Dr. Goering's causation arguments but did not focus on the district court's conclusions regarding the existence and breach of duty. Because we disagree with the Court of Appeals' holding, we must consider whether the district court erred as well. Consequently, we will examine the evidence related to all of the required elements.

We begin with the basis for the district court's ruling. The court reasoned:

"There is no legal duty, the Court can find on the part of a doctor, to follow up with the plaintiff after receipt of a report that shows that there is a benign or nonmalignant finding on a matter that's been sent for investigation.

. . . .

"There is no expert opinion established that Defendant Goering departed from the standard of care for failing to order a biopsy. . . .

"I find a one-time visit to a doctor does not establish a requirement that the doctor call a patient and check up on their wellness. In this case, you just can't have a patient-doctor relationship that requires that kind of thing, absent, especially in this case, absent some finding that there has been an ongoing basis for that kind of procedure or expectation by the client or by the patient with the doctor.

14

"I don't think any reasonable jury presented with this could find that Dr. Goering departed from the standard of care in the care and treatment she provided to the plaintiff. As a result, the Court is going to grant a directed verdict to Dr. Goering from all the issues and allow her to be dismissed from the case."

The district court's ruling could be read in several ways: (1) factually, the physician-patient relationship ended once Dr. Goering received the report indicating the lump was not malignant; (2) as a matter of law, the act of referring a patient to another physician ends a general practice physician's duty; or (3) there was no expert testimony that Dr. Goering breached the standard of care. The first two possibilities relate to the question of Dr. Goering's duty.

> 1.1. *Russell presented sufficient evidence from which a jury could conclude Dr. Goering owed a duty to meet the standard of care.*

Whether a physician owes a legal duty is a question of law over which we exercise unlimited review. *Irvin v. Smith*, 272 Kan. 112, 122, 31 P.3d 934 (2001); *Adams v. Via Christi Regional Med. Center*, 270 Kan. 824, 834, 19 P.3d 132 (2001). As a matter of law, a legal duty arises with the formation of a physician-patient relationship. *Irvin*, 272 Kan. at 122. And the legal question is: What is that duty? Simply put, a "health care provider owes the patient a duty of care, which obligate[s] the provider to meet or exceed a certain standard of care to protect the patient from injury." *Bates v. Dodge City Healthcare Group*, 296 Kan. 271, Syl. ¶ 3, 291 P.3d 1042 (2013). From that point, questions of fact typically arise: (1) Is there a physician-patient relationship under the facts of the case? (2) What is the applicable standard of care under the circumstances of the case? and (3) Was that standard of care met?

As to the first question, the existence of a physician-patient relationship depends on consent. Thus, "where there is no ongoing physician-patient relationship, the

physician's express or implied consent to advise or treat the patient is required for the relationship to come in to being." *Adams*, 270 Kan. at 835. If the controlling facts relating to whether a physician-patient relationship existed are undisputed, a question of law arises. If, however, the controlling facts are at issue, the existence of a physician-patient relationship is usually a question of fact for the jury. See *Irvin*, 272 Kan. at 119.

Here, Russell met her burden of presenting legally sufficient evidence from which a reasonable jury could conclude that Dr. Goering had a physician-patient relationship with Russell. Russell called Dr. Goering's office when she felt a lump, and Dr. Goering manifested her consent to the relationship:  She took the scheduled appointment, obtained information from her patient, palpated the lump, referred Russell for a mammogram and possible sonogram, and received a copy of the imaging report. See *Irvin*, 272 Kan. at 120 ("Generally, a physician-patient relationship is created only where the physician personally examines the patient."). The district court did not suggest otherwise but seemed to view the relationship as being limited to the one visit that resulted in a referral for a mammogram and possible sonogram. The district court's reasoning, as we have noted, could be because the facts indicate the relationship ended or because the relationship ended as a matter of law once the referral was made—*i.e.*, the relationship was not "ongoing." See *Adams*, 270 Kan. at 835.

As to the first possibility, we conclude the question of whether the relationship ended presented a question of fact not susceptible to resolution through a motion for judgment as a matter of law. Typically, the relationship "continues until it is ended by consent of the parties or revocation by dismissal of the physician or until the services of the physician are no longer needed." 1 Pegalis, American Law of Medical Malpractice § 2.3 (3d ed. 2005). Whether these circumstances exist presents a question of fact that can be resolved as a matter of law only if the facts are uncontroverted. See *Irvin*, 272 Kan. at 119; *Sampson*, 233 Kan. at 578.

16

In this case, the facts, if anything, indicate an ongoing relationship between Russell and Dr. Goering. Neither Russell nor Dr. Goering presented evidence that either of them consented to the end of a relationship or that Russell revoked the relationship by dismissal. And though Dr. Goering's counsel argued her involvement was limited to a one-time visit, the evidence showed that Drs. Goering, Kindel, and May understood that if Russell noticed any change in her breast she would contact Dr. Goering, and the fact that Russell did so indicates Russell also understood the relationship continued. At a minimum, the question of whether the relationship terminated, if truly a factual issue in the case, should have been one for the jury.

Likewise, a question of fact exists related to the second possible interpretation of the district court's ruling that a referral to another physician—especially a specialist— legally relieves the referring physician of any duty she or he owes to a patient. On this point, the district court conflated duty (Is there a physician-patient relationship here giving rise to a duty?) with standard of care (Does expert testimony establish the duty requires follow-up with the patient in this case?). Contrary to the apparent conclusion of the district court, "[t]he standard of medical and hospital care which is to be applied in each case is not a rule of law, but strictly a matter to be established by the testimony of competent medical experts." *Bates*, 296 Kan. 271, Syl. ¶ 4. In other words, a *factual* question arises because "the particular decisions and acts required to satisfy that duty of care vary . . . . What constitutes negligence in a particular situation is judged by the professional standards of the particular area of medicine involved." 296 Kan. at 302. As a result, the applicable standard of care is generally established through expert testimony "except where lack of reasonable care . . . is apparent to an average layperson from common knowledge or experience." *Puckett v. Mt. Carmel Regional Med. Center*, 290 Kan. 406, 435-36, 228 P.3d 1048 (2010). No one suggests the facts of this case fall within the common-knowledge exception.

17

Judgment as a matter of law was not appropriate on the first element of whether a duty existed. See *Drouhard-Nordhus*, 301 Kan. at 623. Consequently, we turn to the second element and must now look to expert testimony to define the scope of what Dr. Goering should have done to meet her duty of ordinary care and diligence.

    1.2.    *Russell presented sufficient evidence from which a jury could conclude Dr. Goering breached the standard of care.*

Russell's expert, Dr. Edney, opined that Dr. Goering breached her duty of ordinary care and diligence and primarily faulted Dr. Goering's failure to follow up with Russell after receiving the results of the imaging study. At that point, according to Dr. Edney, Dr. Goering had two choices to satisfy the standard of care: "A, you biopsy, make arrangements for a biopsy on the spot. You, know, either by yourself, if that's within your skill set, or send it to somebody to get it done. Or, B, see them back in a finite period of time." At face value, Dr. Edney's opinion about the standard of care required Dr. Goering to make arrangements for a biopsy, which she did not do, or arrange a follow-up appointment. Hence, Dr. Edney's testimony established that Dr. Goering's standard of care did not end when she referred Russell to a specialist, and the district court erred when it concluded "no expert opinion established that Defendant Goering departed from the standard of care for failing to order a biopsy."

Dr. Edney's explanation as to why Dr. Goering had the duty to order a biopsy or schedule a follow-up appointment relates to some of the arguments Dr. Goering makes on appeal. Dr. Edney testified that the duty arose, in part, because of the inconsistency between Dr. May's conclusion that the lump was a fatty lobule and Dr. Goering's own physical finding of a firm lump. Dr. Edney explained that cancers are firm, unlike other conditions that may be felt in the breast. In a case like Russell's, where there is a difference between the physician's clinical findings and the imaging studies, the standard

18

of care, according to Dr. Edney, requires either an immediate biopsy, which Dr. May did not do, or, alternatively, in the case of a premenopausal woman like Russell, for Dr. Goering to schedule a follow-up visit to determine whether the mass persisted. Dr. Edney testified during direct examination the follow-up examination should occur within two to three months, but he conceded during cross-examination that a follow-up visit six months later would have met the standard of care. If the follow-up visit revealed that the mass was still present, then the physician should order a biopsy. Dr. Edney emphasized the high rate of false imaging results, averaging 15% among women generally, and up to 25 to 30% in younger patients such as Russell. Dr. Edney thus provided testimony that could support a reasonable jury conclusion that Dr. Goering's conduct breached the standard of care.

Russell also introduced a learned treatise, which Dr. Edney identified as authoritative and reliable. The treatise, McPhee, Papakis & Tierney, Current Medical Diagnosis and Treatment, pp. 617-18 (47th ed. 2008), a basic text used at the University of Kansas School of Medicine, explains:

> "All breast masses require a histologic diagnosis with one probable exception, a nonsuspicious, presumably fibrocystic mass, in a premenopausal woman. Rather these masses can be observed through one or two menstrual cycles. However, if the mass does not completely resolve during this time, it must be biopsied."

This treatise thus bolsters Dr. Edney's claim that further follow-up with Russell was required.

Dr. Goering counters by arguing that Dr. Edney did "not provide a clearly defined standard of care opinion against Dr. Goering, and his testimony is difficult to follow." She then points out seemingly contradictory answers and some concessions by Dr. Edney

19

during cross-examination. In this testimony, Dr. Edney stated that Dr. Goering's referral to Dr. May met the standard of care and that the standard of care did not require Dr. Goering to interpret the diagnostic studies herself. Dr. Edney also conceded, on cross-examination, that an immediate biopsy was not required for Dr. Goering to meet the standard of care. In addition, Dr. Edney, when confronted with his deposition testimony, stated Dr. Goering could have met the standard of care regarding alternative A (arranging for a biopsy immediately after receiving the imaging study results) by referring Russell to a radiologist or breast surgeon.

Dr. Goering uses the last portion of the above-quoted testimony—that Dr. Goering could have met the standard of care regarding alternative A by referring Russell to a radiologist or breast surgeon—to argue she met the standard of care by referring Russell to Dr. May. In her view, Dr. Edney's original opinion was that she could meet her standard of care through alternative A (referral) *or* B (seeing Russell again in a finite period of time), and she satisfied alternative A.

These arguments misinterpret Dr. Edney's testimony or, at least, do not view that testimony in a light most favorable to Russell. Dr. Edney focused on the time period *after* Dr. Goering received the imaging results. At that point, according to Dr. Edney, Dr. Goering should either have arranged for a biopsy or scheduled a follow-up appointment with Russell. Here, Dr. Goering only arranged for an initial referral. And, on redirect, Dr. Edney clarified that, "[i]n the context that we're referring to, specifically this case, that is not satisfactory."

In addition to criticizing Dr. Goering for her lack of action upon receipt of Dr. May's report, Dr. Edney testified Dr. Goering should have done more at the first appointment. Specifically, when asked whether he had a criticism of Dr. Goering as of

20

the time Russell walked out of her office in 2008, he replied, "Well, I guess I would. Where I did not see any arrangements for a follow-up visit."

Dr. Goering asks us to disregard Dr. Edney's testimony about deviations from the standard of care relating to the first appointment, when Dr. Goering physically examined Russell. Dr. Goering argues that any such opinions go beyond Russell's pretrial disclosures, which focused on the time period after the appointment. But the district court's pretrial order, in listing Russell's claims against each of the physicians, stated Russell's contention against Dr. Goering as follows: Dr. Goering failed "to recommend biopsy or additional, timely evaluation, even in the face of a reported normal imaging study." This contention is without temporal limitation and can thus include the very first meeting with Dr. Goering. We also note that Dr. Goering did not object to the various answers by Dr. Edney relating to obligations arising at or because of that first appointment in 2008. By not objecting, Dr. Goering has failed to preserve her objection for our consideration. See K.S.A. 60-404.

Throughout all these arguments, Dr. Goering essentially asks us to weigh the evidence and to draw all inferences in a light most favorable to her. If we do so, we can conclude that the jury could have found that she was not at fault. But that is not our test. We must flip the inquiry and look at the evidence and inferences drawn therefrom in the light most favorable to Russell. In that light, we conclude Russell presented sufficient evidence, through Dr. Edney's testimony with the medical treatise's support, from which a reasonable jury could conclude the standard of care required Dr. Goering to follow up with Russell—even in light of Dr. May's diagnosis of a benign tumor. In other words, Russell presented evidence of duty, the standard of care, and a breach of the standard of care. None of these three elements were undisputed, and so a judgment as a matter of law on these matters was not appropriate.

As such, the district court erred in concluding as a matter of law that Dr. Goering did not breach any duty owed to Russell. See *Bussman*, 298 Kan. at 706-07; *Sampson*, 233 Kan. at 578; *Mathes*, 205 Kan. at 403. This leaves two remaining elements: whether the patient was injured and whether the injury proximately resulted from a breach of the standard of care. See *Drouhard-Nordhus*, 301 Kan. at 623.

    1.3.    *Russell presented sufficient evidence from which a reasonable jury could conclude Dr. Goering's conduct proximately caused Russell's delayed diagnosis and resulting damages.*

This brings us to the basis for the Court of Appeals' conclusion that judgment as a matter of law in favor of Dr. Goering was appropriate because Russell's injury was *not* the proximate result of Dr. Goering's actions. Essentially, the Court of Appeals, along with Dr. Goering, emphasizes that Russell had follow-up appointments—appointments with Drs. May and Kindel—at which the physicians concluded a biopsy was not warranted. Dr. Goering argues she could not have caused Russell's injuries when both Drs. May and Kindel had subsequent opportunities to diagnose the cancer. She further points to a statement by Dr. Edney that the standard of care would have been met if a biopsy had been conducted when Dr. Kindel first saw Russell after the mammogram. These arguments relate to the question of whether Dr. Goering's failure to schedule an appointment was the *proximate* cause of Russell's injuries, a question we address next.

Some general principles help frame the question of whether Russell presented sufficient evidence of proximate cause. First, as we have already noted, Russell had to establish that any deviation from the standard of care by Dr. Goering caused Russell's injury. See *Drouhard-Nordhus*, 301 Kan. at 623. Second, in general terms, proximate cause can be defined as a cause that "in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury and without which the injury would not have occurred, the injury being the natural and probable consequence of the wrongful

22

act." *Puckett,* 290 Kan. at 420. Third, proximate cause has two components, both of which must be proved by the plaintiff: cause in fact and legal causation.

To prove cause in fact, a plaintiff must submit "sufficient evidence from which a jury could conclude that more likely than not, but for defendant's conduct, the plaintiff's injuries would not have occurred" or, as in this case, would have been less. *Puckett*, 290 Kan. at 420. The Court of Appeals rested its decision, in part, on what it saw as a hole in Russell's cause-in-fact evidence: "Had Dr. Goering insisted on seeing Russell within three months following these diagnostic tests, there is no evidence the outcome of Russell's care would have been any different." *Russell*, 2015 WL 5750546, at *4. After a review of the record, we disagree with this conclusion.

Russell testified she first found a lump in her breast in August 2008 and that she was confident the lump was the same lump as was later diagnosed as cancerous. Russell also testified to her various visits to each of the three physicians and to her treatment once cancer was diagnosed. She explained that she was required to undergo a full mastectomy; a lumpectomy was not an option for her. Russell also testified without objection that the physician treating her cancer believed the lump was the same one present in 2008.

Dr. Edney testified he was almost certain that the cancerous lump removed in 2010 was the same as the one in 2008 and that the cancer was capable of being discovered in 2008. Dr. Edney indicated the cancer appears to have been stage 1 breast cancer in 2008, but, by the time of diagnosis in 2010, the cancer was stage 3A. Dr. Edney detailed the differences in required treatment based on the 2008 records and the 2010 records. In his opinion, Russell would have had the option of breast conservation if the cancer had been diagnosed in 2008. But by 2010, the tumor was 5.5 centimeters and cancer had spread to four lymph nodes, which required a mastectomy and radiation. Dr.

23

Edney also testified Russell's chance of cure decreased by approximately 40% as a result of the delayed diagnosis.

Contrary to the Court of Appeals' conclusion, Dr. Edney's testimony created a question of fact. In his opinion, a physician exercising reasonable diligence and care would have performed a biopsy, either immediately or after appropriate follow-up revealed the lump persisted. And, in Dr. Edney's opinion, a biopsy performed in 2008 would have revealed the presence of a stage 1 cancer. Finally, he explained that the delay limited the treatment options and reduced Russell's chance of cure, which reflected Russell's own testimony about the lump and damages resulting from delay. This evidence undercuts the Court of Appeals' cause-in-fact conclusion that "there is no evidence the outcome from Russell's care would have been any different" if Dr. Goering had met the standard of care enunciated by Dr. Edney and had performed a biopsy within months of her initial examination. *Russell*, 2015 WL 5750546, at *4.

In summary, reviewing Russell's evidence and resolving all facts and inferences in her favor, we determine that a reasonable jury could conclude (1) the lump diagnosed as cancer in 2010 was the same lump found in 2008, (2) proper follow-up by Dr. Goering would have led to an earlier diagnosis, and (3) the delay in treatment required more invasive procedures and resulted in a reduced chance of cure. Thus, a reasonable jury could have found both causation in fact and injury based on Russell's evidence.

Regarding the second aspect of causation—legal causation—Dr. Goering essentially argues that any causal link between her potential malpractice and Russell's harm was broken by Russell's 2009 and 2010 appointments with Dr. Kindel. Dr. Goering focused on this argument at the district court's hearing for judgment as a matter of law. She argued then and argues now that Dr. Edney never said that Dr. Goering herself

24

needed to provide the follow-up care and that Dr. Kindel saw Russell within an appropriate time frame for the follow-up care, even according to Dr. Edney.

We pause to note that, viewing the evidence in the light most favorable to Russell, Dr. Edney actually said that *Dr. Goering* should have seen Russell after the imaging results. He also testified that because of the potential conflict between Dr. Goering's physical examination and Dr. May's conclusions, Dr. Goering should have ordered a biopsy or scheduled a follow-up visit to determine whether the mass resolved.

Regardless, however, the Court of Appeals adopted Russell's legal causation argument, stating: "After the initial diagnostic tests, each time Dr. Kindel examined Russell's breasts in February 2009 and again in February 2010, she found no cause for additional diagnostic testing. Even if Dr. Goering should have instructed Russell to seek follow-up care and failed to do so, Russell nevertheless did receive that follow-up care from Dr. Kindel, her OB/GYN." *Russell*, 2015 WL 5750546, at *4. Dr. Goering asks us to affirm this conclusion regarding legal causation because, she argues, she is absolved of liability because, regardless of whether she failed to advise Russell to obtain follow-up care and provide Russell follow-up care, Russell pursued follow-up care with Drs. May and Kindel. Several legal principles must be considered in analyzing this argument.

To prove legal causation, Russell must show it was foreseeable that Dr. Goering's conduct might create a risk of harm to Russell and that the result of that conduct and contributing causes were also foreseeable. See *Yount v. Deibert*, 282 Kan. 619, 624-25, 147 P.3d 1065 (2006). "The concept of 'intervening cause' relates to legal causation and 'does not come into play until after causation in fact has been established.' [Citation omitted.]" *Puckett*, 290 Kan. at 421. Often, "[a]n intervening cause is one which actively operates in producing harm to another after the actor's negligent act or omission has been committed." Restatement (Second) of Torts § 441 (1965). But "[a] force set in motion at

25

an earlier time is an intervening force if it first operates after the actor has lost control of the situation and the actor neither knew nor should have known of its existence at the time of his negligent conduct." Restatement (Second) of Torts § 441, Comment *a*; see *Mashaney v. Board of Indigents' Defense Services*, 302 Kan. 625, 654, 355 P.3d 667 (2015) (Stegall, concurring); *State v. Chastain*, 265 Kan. 16, 960 P.2d 756 (1998). An intervening cause absolves a defendant of liability only if it supersedes the defendant's negligence. In other words, the superseding and intervening cause component breaks the connection between a negligent act and the harm caused. See *Hale v. Brown*, 287 Kan. 320, 324, 197 P.3d 438 (2008). One more factor—foreseeability—must be considered. "If the intervening cause is foreseen or might reasonably have been foreseen by the first actor, his negligence may be considered the proximate cause, notwithstanding the intervening cause. [Citation omitted.]" *Miller v. Zep Mfg. Co.*, 249 Kan. 34, 51, 815 P.2d 506 (1991).

Thus, even if the follow-up appointments with Drs. May and Kindel were intervening causes, Dr. Goering's deviation from the standard of care may still be a proximate cause of Russell's harm if the intervening causes were reasonably foreseeable. See *Puckett*, 290 Kan. at 421. Hence, the appropriate inquiry for examining Dr. Goering's argument is: At the point when the district court ruled there were jury questions to be resolved regarding the potential negligence of both Drs. May and Kindel, could it have been determined as a matter of law that Dr. Goering could not foresee Drs. May and Kindel's potential negligence? Only if the potential for subsequent negligence was not foreseeable may a court find a superseding or intervening cause that breaks the causal chain so as to relieve Dr. Goering of liability. See *Puckett*, 290 Kan. at 421.

Based on the evidence Russell had presented, the district court correctly felt that there were issues of fact regarding Drs. May and Kindel, meaning foreseeability could not be determined as a matter of law.

Turning first to Dr. May, the district court faced the following question when ruling on Dr. Goering's motion for judgment as a matter of law:  Was it foreseeable that a radiologist performing a mammogram and sonogram would miss cancer that was present on the imaging? The expert testimony makes it clear that this possibility was foreseeable. Dr. Edney testified to the possibility—even without negligence—for the imaging studies to be incorrect. He provided the statistics regarding the accuracy rates and discussed the increased possibility of missed cancer for a younger woman like Russell. Therefore, Dr. Goering could have reasonably foreseen the possibility of a false result. (And, as previously noted, Dr. Edney told the jury it was this very possibility that gave rise to the need for a timely follow-up visit.) Dr. Goering argues the statistics about false mammogram images are not valid when a sonogram is performed, as was done by Dr. May in this case. But while the sonogram may reduce the persuasiveness of the statistical evidence, it does not erase Dr. Edney's testimony or foreclose the possibility of negligence by the radiologist.

We discussed this later point in our decision in *Puckett*, where we held that while a negligent health care provider is not solely liable for the subsequent negligence of other treating health care providers, he or she may be held comparatively negligent based on his or her own negligence when the subsequent negligence is foreseeable. *Puckett*, 290 Kan. at 424-25. We relied on the Restatement (Second) of Torts § 457 (1965). Comment b to that section recognizes "there is a risk involved in the human fallibility of physicians, surgeons, nurses, and hospital staffs which is inherent in the necessity of seeking their services." Correspondingly, in *Puckett,* 290 Kan. at 429, we noted that "it is only in extraordinary cases that there is an intervening cause," which means that the foreseeability of the harm almost always presents a question for the trier of fact. Foreseeability cannot be decided as a matter of law unless reasonable persons could

arrive at only one conclusion: The intervening cause could not have been reasonably foreseen. *Puckett*, 290 Kan. at 434.

No evidence in this case suggests Dr. May is immune from human fallibility. Nor does the evidence provide any other reason this case presents the extraordinary circumstances where her potential negligence could not have been foreseen.

The same general conclusion applies to Dr. Kindel. In addition, Dr. Edney's testimony provided a basis for a jury conclusion that Dr. Kindel would not be aware of the inconsistency between the radiology report, which she had not seen, and the physical attributes of the breast lump. A question existed for the jury as to whether it was foreseeable that, without Dr. Goering's follow-up, a biopsy would not be performed before treatment options and risk factors changed in a way that caused injury to Russell.

Dr. Goering counters with several arguments. In one, she cites *Hale*, 287 Kan. at 324, for its statement that the passage of time may be a factor in determining whether a subsequent event acts as an intervening cause. While this may be true in a case such as *Hale*, which involved two driving incidents separated by time, it does not send a strong signal that an intervening cause is present when, according to Dr. Edney's opinion, prompt action by Dr. Goering would have made a difference in outcome and the nature of Russell's damages.

In her other arguments, Dr. Goering points to what she perceives as weaknesses in Russell's evidence. As we have discussed, those weaknesses may ultimately account for the jury verdict finding no fault by Drs. Kindel and May. But trial and appellate judges considering a motion for judgment as a matter of law do not weigh testimony. Instead, we examine the evidence in the light most favorable to Russell, and, when considered in that light, we conclude there was legally sufficient evidence from which a reasonable jury

could find Dr. Goering's conduct caused Russell's injury. And the evidence does not establish as a matter of law that any subsequent intervening or superseding cause terminated the causal chain. The evidence, in the light most favorable to Russell, supports the foreseeability of a false image and the foreseeability that the false reading would mean other health care providers would not perform a biopsy. That was precisely the reason, according to Dr. Edney, Dr. Goering should have scheduled a follow-up appointment and/or ensured that someone performed the necessary biopsy. Accordingly, the Court of Appeals erred in affirming the district court on the causation element because the evidence presented provided sufficient basis from which a reasonable jury could conclude Dr. Goering's conduct proximately caused Russell's damages.

We, therefore, conclude that the district court erred in granting Dr. Goering's motion for judgment as a matter of law under K.S.A. 2016 Supp. 60-260(a).

1.4.    *We cannot determine the error was harmless.*

Dr. Goering alternatively urges this court to determine that even if judgment was rendered in error such error was harmless. Harmless error may preserve a judgment in some cases:

> "Unless justice requires otherwise, no error . . . by the court or a party, is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights." K.S.A. 2016 Supp. 60-261.

The scope of K.S.A. 2016 Supp. 60-261 is sufficiently broad to apply here. Russell seeks a decision that would vacate, modify, or otherwise disturb the district court's

29

judgment in favor of Dr. Goering. But the question is: How do we determine whether the error granting judgment in favor of Dr. Goering affected a party's substantial rights?

As Dr. Goering concedes, this court has not previously applied a harmless error standard in the context of a judgment as a matter of law. Rather, this court has stated that if an appellate court determines the "evidence is such that reasonable minds could reach different conclusions, the [directed] verdict should be reversed." *Enlow v. Sears, Roebuck & Co.*, 249 Kan. 732, 737, 822 P.2d 617 (1991) (citing *Baker v. City of Garden City*, 240 Kan. 554, 556, 731 P.2d 278 [1987]); see also *National Bank of Andover v. Kansas Bankers Surety Co.*, 290 Kan. 247, 286, 225 P.3d 707 (2010) ("The finder of fact must make this ultimate determination."). Perhaps this is because the Kansas Constitution Bill of Rights, § 5 provides that "[t]he right of trial shall be inviolate." Nevertheless, this court has recognized that the constitutional right to a "jury trial presupposes the power of a trial judge to withdraw a case from the jury upon a point of law under proper procedure." *Ogilvie v. Mangels*, 183 Kan. 733, 738, 332 P.2d 581 (1958). These cases lead us to question whether an error in granting a motion for judgment as a matter of law as to some claims or parties can only be harmless when a jury verdict against other parties or claims establishes that judgment could be entered as a matter of law—that is, where no questions exist for further resolution through the trial process.

Dr. Goering does not address that question. She simply cites to our general caselaw where we review appeals from a verdict reached after a full trial. Generally, in these cases, when evaluating trial error on evidentiary issues, jury instructions, motions for mistrial, and most other trial issues, appellate courts examine whether the error affected the trial's outcome. In those cases, if a constitutional error has occurred, it can be deemed harmless only if "there is no reasonable possibility that the error contributed to the verdict," at least in criminal cases. For nonconstitutional errors in criminal and civil cases resulting in a verdict, appellate courts determine whether "there is a reasonable

30

probability that the error did or will affect the outcome of the trial in light of the entire record." *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011); see also *Foster v. Klaumann*, 296 Kan. 295, 305, 294 P.3d 223 (2013). Dr. Goering cites to *Foster* and its statement of the nonconstitutional error standard and asks us to apply that same standard in this case.

Here, however, where no trial on Russell's claims against Goering was ever completed, we are not persuaded that the harmless error analysis for trial errors—whether constitutional or nonconstitutional—necessarily fits. Even if we were to conclude that the typical harmless error analysis should be applied, we are reluctant to rule whether errors of the sort alleged here would be constitutional or nonconstitutional. Granted, Russell has not urged us to apply a constitutional standard. But we cannot ignore the constitutional right to trial, especially when Dr. Goering has presented us with no arguments justifying her proposal to apply the nonconstitutional standard. Moreover, although Dr. Goering cites cases from other jurisdictions that have held an error in granting a motion for judgment as a matter of law was harmless, none of those cases applies a test using reasonable probability (*i.e.*, nonconstitutional harmless error standard) as the level of certainty.

In fact, the cases Dr. Goering cites from other jurisdictions treat the harmless error standard as the equivalent of making a judgment as a matter of law—there can be no issue of fact. As stated in one case: "A wrongly directed verdict in favor of one party is harmless where the jury's ultimate verdict *necessarily defeats* the claim against the dismissed party." (Emphasis added.) *Goulet v. New Penn Motor Exp., Inc.*, 512 F.3d 34, 43 (1st Cir. 2008). In another of the cases, *Janich Bros., Inc. v. Am. Distilling Co.*, 570 F.2d 848, 855 (9th Cir. 1977), the court concluded an error was harmless because the jury returned a verdict in favor of the same defendant on another count where the issue the jury had to determine was "identical" to the issue that it would have determined on the

dismissed count. Likewise, the Utah Court of Appeals stated: "Although normally we would be reluctant to uphold an erroneous directed verdict on harmless error grounds, in this case we cannot ignore the fact that the jury's verdict would not have differed had the trial judge not granted [the defendant's] partial directed verdict." *Steffensen v. Smith's Management Corp.*, 820 P.2d 482, 489-90 (Utah Ct. App. 1991). In the two remaining cases cited by Dr. Goering, the courts did not articulate a standard, but they applied the functional equivalent of the necessarily defeated or identical claim standard. See *Earle v. Benoit*, 850 F.2d 836 (1st Cir. 1988); *Toomey v. Tolin*, 311 So. 2d 678 (Fla. Dist. Ct. App. 1975).

Our caselaw does not foreclose application of such standards when testing harmless error in the context of a motion for judgment as a matter of law. Indeed, we have applied unique tests in other circumstances. See, *e.g.*, *State v. Williams*, 295 Kan. 506, Syl. ¶ 5, 511, 286 P.3d 195 (2012) (applying K.S.A. 22-3414[3] when no objection has been made regarding a jury instruction and holding that in such a case a jury instruction error results in reversal only where the error is clearly erroneous, which means "the court assesses whether it is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred"). Like the situation with K.S.A. 2016 Supp. 22-3414(3), the standards required under K.S.A. 2016 Supp. 60-250(a) could require a unique harmless-error standard because substantial justice requires such a motion to be granted only when no issues of fact remain.

We hesitate to adopt any harmless error standard specific to motions for judgment as a matter of law when these various issues have not been briefed or argued by the parties. We raise the various possibilities and justifications only to explain our reticence to endorse a standard applicable to all similar cases. With proper argument, we may be persuaded that either a constitutional or the nonconstitutional error standards discussed in cases such as *Ward* or *Foster* should apply in situations like Russell's.

In this case, we elect to apply the five cases from other jurisdictions discussed by the parties. These cases lead us to conclude the error in granting Dr. Goering's judgment as a matter of law cannot be declared harmless.

In some of the cases cited by Dr. Goering, the jury answered special questions that allowed the court to apply the jury's finding of fact to a dismissed count or party. See *Earle*, 850 F.2d at 836 (jury's determination that state troopers did not violate civil rights on two occasions meant that dismissed defendants could not be liable for civil rights violations arising from the same two incidents); *Steffensen*, 820 P.2d 482 (jury's indication on verdict form that the defendant had been negligent but did not proximately cause injury necessarily defeated claims based on another theory of negligence against the same defendant that related to the same events; the additional grounds for finding negligence rested on the same proximate cause theory and facts). In the three other cases, the jury's verdict on another count or as to other defendants necessarily defeated the plaintiff's claim on a dismissed count or against a dismissed defendant.

For example, in *Toomey*, 311 So. 2d at 681, a jury verdict in favor of two law enforcement officers on an allegation of false arrest meant that a false arrest had not occurred and that other defendants, who had been dismissed, could not be liable for false arrest claims arising from the same incidents. Another case, *Janich Bros., Inc.*, 570 F.2d 848, involved a private antitrust action against a single defendant on multiple counts. The appellate court determined the dismissal of one count resulted in harmless error because the jury had reached a verdict in the defendant's favor on another count that required the same elements of proof as the dismissed count—in particular, proof of injury to a seller's competition. 570 F.2d at 855. Finally, in *Goulet*, 512 F.3d 34, a jury verdict in favor of the plaintiff's union necessarily defeated a breach of contract claim against another defendant.

33

More specifically, the *Goulet* plaintiff had sued his union for not properly representing him in a dispute with a company that was acquiring the plaintiff's employer. He had also sued the acquiring company for breach of contract. At trial, the court granted a directed verdict to the acquiring company, reasoning that the issue of the alleged breach of a labor contract had been resolved through a grievance process in which the union represented the plaintiff. The trial court concluded that, as a matter of law, the breach of contract issue could not be relitigated. The case continued against the union, but the jury returned a verdict in the union's favor. On appeal, the plaintiff argued his claims against the acquiring company were not necessarily precluded because he failed to timely preserve his claim during the grievance proceeding. The appellate court, assuming error, found the alleged error harmless in light of the jury's verdict. The appellate court concluded the jury could have reached its verdict in only two ways: First, the jury could have concluded that the acquiring company had violated the contract but the union had nonetheless properly represented the plaintiff, in which case the grievance proceeding was binding and the matter could not be relitigated. Second, the jury could have concluded the acquiring company had not violated the contract, making it irrelevant whether the union had provided proper representation and also leaving the plaintiff with no recourse against the acquiring company. *Goulet*, 512 F.3d at 43.

In contrast to the five cases relied on by Russell, in Russell's case we cannot determine that the jury verdict in favor of Drs. Kindel and May necessarily defeats the claim against Dr. Goering. The jury did not answer special questions. Therefore, we do not know whether the jury found that Drs. Kindel and May, or one or the other of them, exercised reasonable care or whether one or both deviated from the standard of care but that deviation was not the proximate cause of Russell's injury. And, unlike the *Goulet*, *Toomey*, and *Janisch Bros.* decisions, the jury verdict does not necessarily prove what the verdict would have been as to Dr. Goering.

34

As Dr. Goering argues, the most likely way we could find an error in granting her judgment as a matter of law harmless would be through a proximate cause route. Both Drs. May and Kindel submitted evidence that the lump palpated in 2008 was not the same lump as was diagnosed as cancerous in 2010. If we knew this to be the basis for the jury's verdict, we could find the error in granting Dr. Goering's motion for judgment as a matter of law to be harmless because we could conclude the proximate cause element of negligence was necessarily defeated. And, at least arguably, if we knew the jury had found Dr. Kindel negligent but had also found that her negligence had not caused Russell harm, we could say the no-proximate-cause verdict necessarily defeated a claim against Dr. Goering, who had treated Russell before Dr. Kindel. But we simply cannot know that the jury's verdict rested on the proximate cause element. The jury might have based its verdict on a determination that Dr. May and/or Dr. Kindel did not breach their respective standards of care; its verdict does not necessarily prove the lack of causation.

As to a deviation from the standard of care, Dr. Goering suggests that she stands in almost identical shoes to Dr. Kindel. Russell disagrees, arguing that Dr. Goering had information not available to Dr. Kindel—the written report of Dr. May and her own experience with the physical examination. Dr. Goering does not dispute this as a factual matter but responds that Dr. Edney did not testify that this distinction played into his opinions or was particularly significant. Nevertheless, the evidence that was presented allowed a reasonable juror to make this inference. And had Dr. Goering remained a party to the trial, the inference may have been argued and highlighted. We simply cannot say that the verdict in Dr. Kindel's favor necessarily defeats Russell's claim that she was denied a substantial chance for better recovery or for long-term survival due to the fault of Dr. Goering.

As to Dr. May, the evidence established that Dr. Goering stood in a different position from Dr. May, even though both had the results of their own physical examinations and the reports regarding the mammogram and sonograms. But there is a significant distinction in the evidence: If the jury accepted Dr. Edney's opinion, Dr. Goering should have followed up with Russell to see whether the lump persisted. This claim of negligence was not made against Dr. May.

Simply put, the jury verdict does not necessarily defeat Russell's claim against Dr. Goering. Based on the authorities cited to us, we cannot find that the district court's error in granting Dr. Goering judgment as a matter of law was harmless. Therefore, as in our past cases where such an error has been found, we remand this case to the district court for a new trial. The remaining question is whether the retrial will include Drs. May and Kindel.

2. *The answers of Dr. May's expert did not affect the trial's outcome, and we decline to order a new trial as to Drs. May and Kindel.*

Only one trial error is preserved for our review that might possibly affect the verdict against Drs. May and Kindel: Russell argues *Dr. May's* expert responded to two questions on cross-examination regarding *Dr. Goering's* standard of care, even though no such opinions had been disclosed during discovery. He argues the district court should have granted his request to strike these answers.

The first answer came in response to a question from Russell's counsel asking if a radiologist had any duty to talk to her patient about the results of imaging studies. Dr. May's expert replied, "No. Standard of care says it goes to the primary care doctor." In answering another question, the expert stated: "[O]nce the imaging studies are normal, the burden then falls normally on the primary care doctor that communicates with the patient."

Even if we assume these answers constituted error, we conclude that the error did not affect Russell's substantial rights. The reasonable probability standard we have just discussed applies here. See K.S.A. 2016 Supp. 60-261. This means that we must be convinced that "there is a reasonable probability that the error did or will affect the outcome of the trial in light of the entire record." *Ward*, 292 Kan. 541, Syl. ¶ 6.

As Dr. May points out, the expert's first answer is ambiguous. When the expert said, "Standard of care says it goes to the primary care doctor," nothing describes what was meant by the word "it." In context, the question follows a series of questions about the radiologist's interpretation of imaging. In this context, Dr. May suggests the "it" refers to the radiologist's report and the statement means the standard of care is to send the report to the primary care physician. Nevertheless, the same ambiguity does not attach to the second answer, in which the expert said that if the results are normal, the "burden then falls normally on the primary care doctor that communicates with the patient." But as Dr. May points out, the answer came in a series of hypothetical questions without reference to the specifics of this case, in which Dr. May spoke directly to Russell and explained her findings and recommendations. Three of Russell's 13 allegations against Dr. May related to alleged deficiencies in the information Dr. May relayed. The expert responded to these specific allegations in this case and in doing so did not deflect responsibility to Dr. Goering, at least by name. And the expert did not deflect responsibility to Dr. Goering by description in any instance except, arguably, the one now at issue. In fact, in his direct testimony, the expert had described what happened in this case, with Dr. May communicating the information to Russell, as the "ideal setting."

Given this context of one passing reference in a hypothetical context as compared to the full scope of the expert's testimony about the specifics of this case and in light of

37

the overall record, we conclude there is no reasonable probability that the assumed error affected the verdict in this case.

Other than this issue, Russell fails to further develop her argument for a new trial against Drs. May and Kindel. At oral argument, Russell's attorney described the argument as one of fairness. But he offered no legal authority for that position, either in briefing or at oral argument. Issues not adequately briefed are deemed waived or abandoned. See *State v. Logsdon*, 304 Kan. 3, 29, 371 P.3d 836 (2016). This includes "point[s] raised only incidentally in a brief but not argued there." *National Bank of Andover*, 290 Kan. at 281 (quoting *Cooke v. Gillespie*, 285 Kan. 748, Syl. ¶ 6, 176 P.3d 144 [2008]). Russell's conclusory statements, unsupported by legal citation, are inadequately briefed. We therefore reject her argument that Drs. Kindel and May should be included on retrial.

CONCLUSION

We reverse the district court's decision granting Dr. Goering judgment as a matter of law and reverse the Court of Appeals decision affirming the district court on that issue. We remand this case to the district court for further proceedings against Dr. Goering. We affirm the jury verdict as to Drs. May and Kindel and affirm the Court of Appeals decision to affirm that verdict.